**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BFG Supply Co., LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 26-11284 (___)<br><br>(Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) AUTHORIZING THE DEBTORS TO DESIGNATE A STALKING HORSE BIDDER AND TO PROVIDE BID PROTECTIONS, (C) SCHEDULING AN AUCTION AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, (E) SCHEDULING A SALE HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND (F) GRANTING RELATED RELIEF; AND (II)(A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors") [2] hereby file this motion (the "Motion") for the entry of (a) an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"), (i) approving bidding procedures, substantially in the form attached to the Bidding Procedures Order as **Exhibit 1** (the "Bidding Procedures"), to be used in connection with the sale (the "Sale") of all, substantially all, or one or more portions of the

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BFG Supply Co., LLC (6660); Bamboo Purchaser, Inc. (1173); BFG Purchaser Parent, Inc. (2451); BFG Supply Holdings, Inc. (4070); BFG Holdings I, Inc. (1502); BFG Supply Canada Holdings, Inc. (9737); De Cloet Greenhouse Mfg. Ltd. (N/A); BFG Kalamazoo, LLC (0121); BFG Logistics, LLC (4172); L&L Nursery Supply, Inc. (9972); Gard'N-Wise Distributors, Inc. (8418); International Greenhouse Contractors, LLC (7313); Greenhouse Solutions, LLC (1860); Greenhouse Contracting Services, LLC (3738); Green-Tek, LLC (8749); GROSouth, Inc. (4231); BFG VG Supply Acquisition, LLC (0219). The Debtors' service address in these chapter 11 cases is 4660 East Paris Avenue SE, Grand Rapids, Michigan 49512.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

Debtors' assets (the "Assets"), (ii) authorizing the Debtors to designate one or more Stalking Horse Bidders (as defined herein) and provide Bid Protections (as defined herein) in accordance with the Stalking Horse Designation Procedures (as defined herein), (iii) scheduling an auction of the Assets (the "Auction"), if any, and scheduling the hearing to approve a sale of the Assets (the "Sale Hearing"), (iv) approving the form and manner of notice of the proposed Bidding Procedures, the Stalking Horse Designation Procedures, the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "Sale Notice"), (v) authorizing procedures governing the assumption and assignment of certain executory contracts and unexpired leases (the "Contracts") in connection with any Sale (the "Assumption and Assignment Procedures"), (vi) approving the form and manner of notice to each relevant non-debtor counterparty to a Contract (each, a "Counterparty") of (A) the Debtors' calculation of the amount necessary to cure any defaults under an applicable Contract (the "Cure Costs") and (B) certain other information regarding the potential assumption and assignment of Contracts in connection with the Sale, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "Assumption and Assignment Notice"), and (vii) granting related relief.

The Debtors will seek entry of one or more sale orders (each, a "Sale Order")[3] at the Sale Hearing, which the Debtors will file in advance of the Sale Hearing. The proposed Sale Order will, among other things: (a) authorize and approve the Sale to the Successful Bidder on the terms substantially set forth in the Successful Bid; (b) authorize and approve the Sale of the Assets free and clear of any liens, claims, interests, and encumbrances to the extent set forth in the asset purchase agreement with the Successful Bidder, attached to the Sale Order; (c) authorize and

[3] The proposed Sale Order will be filed prior to the Sale Hearing.

approve the assumption and assignment of certain Contracts to the Successful Bidder; and (d) grant related relief.

In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Neil Gupta* in support of the Motion, filed contemporaneously herewith (the "Gupta Declaration"), and the *Declaration of Adam Zalev in Support of the Debtors' Chapter 11 Petition and First Day Motions* (the "First Day Declaration"). In further support of this Motion, the Debtors, by and through their undersigned proposed counsel, respectfully represent:

## Preliminary Statement

1. As described in the First Day Declaration, after carefully considering alternatives, the Debtors, in an exercise of their reasonable business judgment, have commenced these Chapter 11 Cases to preserve going-concern value, maximize the value of their estates for the benefit of all stakeholders, and pursue a value-maximizing transaction through the chapter 11 process. Together with their advisors, the Debtors determined that preservation of value for all stakeholders would be best accomplished by pursuing a sale of the Debtors' business and/or assets as a going concern or otherwise, while the Debtors simultaneously commence an orderly liquidation of the Debtors' inventory and other working capital assets.[4] To support the Debtors in their marketing and sale process and to ensure that value is maximized, the Debtors retained SSG Advisors, LLC ("SSG") on August 6, 2026 to serve as the investment banker to the Debtors and to run a comprehensive sale and marketing process designed to maximize the value of the Assets on a going concern basis.

2. Through this Motion, the Debtors seek the Court's approval of Bidding Procedures pursuant to which the Debtors will seek bids for all or a subset of their assets, and the ability to

[4] *See Motion of Debtors for Interim and Final Orders (I)(A) Confirming, on an Interim Basis, that the Services Agreement is Operative and Effective and (B) Authorizing, on a Final Basis, the Debtors to Assume the Services Agreement; (II) Authorizing and Approving the Sales of Liquidation Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief.*

designate one or more Stalking Horse Bidders to set a floor at an Auction. The Debtors acknowledge that the proposed timelines laid out below are expedient, but such is required in light of the fact that the Debtors have limited liquidity remaining, and so do not have the luxury of being able to conduct a more deliberate sale/marketing process (and such elongated process, and the uncertainty caused thereby, would likely damage key vendor and customer relationships). That said, the Debtors are confident that the DIP financing offered by their secured lenders – if approved by this Court – would be sufficient to allow the Debtors to run the sale process described herein without any financial interruption. In sum, the Debtors believe that the proposed timeline below maximizes value to the estates both by providing for a robust sale process and minimizing value-destructive business disruption from a prolonged stay in chapter 11.

| DEADLINE | EVENT |
|---|---|
| **Two business days after the entry of the Bidding Procedures Order** | Deadline for Debtors to file and serve Sale Notice |
| **Two business days after the entry of the Bidding Procedures Order** | Deadline for Debtors to file and serve Assumption and Assignment Notice |
| **September 25, 2026, at 4:00 p.m. (prevailing Eastern Time)** | Cure Objection Deadline |
| **September 28, 2026, at 4:00 p.m. (prevailing Eastern Time)** | Deadline for Debtors to designate a Stalking Horse Bidder |
| **October 1, 2026, at 4:00 p.m. (prevailing Eastern Time)** | Sale Objection Deadline |
| **October 2, 2026, at 4:00 p.m. (prevailing Eastern Time)** | Bid Deadline |
| **October 6, 2026, at 10:00 a.m. (prevailing Eastern Time)** | Auction |
| **One business day after the conclusion of the Auction** | Deadline for Debtors to file and serve Notice of Auction Results |
| **October 12, 2026, at 4:00 p.m. (prevailing Eastern Time)** | Supplemental Sale Objection Deadline and Adequate Assurance Objection Deadline |
| **October 13, 2026, at 4:00 p.m. (prevailing Eastern Time)** | Debtors' Deadline to Reply to Sale Objections and Supplemental Sale Objections |
| **October 14, 2026, subject to the** | Sale Hearing |

| | |
|---|---|
| **availability of the Court** | |
| **October 21, 2026** | Deadline for entry of a recognition order in the recognition proceedings commenced before the Ontario Superior Court of Justice (Commercial List) (the "Recognition Proceedings") (if necessary) |
| **October 22, 2026** | Deadline to consummate approved Sale |

## Jurisdiction and Venue

3. The United States District Court for the District of Delaware has jurisdiction to consider this Motion under 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b) and, pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4. Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

5. The statutory and legal predicates for the relief sought herein are sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rules 2002-1, 6004-1 and 9006-1.

## Background

6. On the date hereof (the "Petition Date"), the Debtors commenced their cases by filing petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

7. The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

8. To date, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"). No trustee or examiner has been appointed in the Chapter 11 Cases.

9. Additional factual background regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the filing of these Chapter 11 Cases is set forth in detail in the First Day Declaration.

**Marketing and Sale Process**

10. On August 6, 2026, the Debtors retained SSG as their investment banker to, among other things: (i) identify and evaluate potential buyers for a potential sale transaction; (ii) prepare a marketing plan and information materials to distribute to potential buyers; (iii) solicit competitive offers from potential buyers of the Assets; (iv) assist the Debtors in contacting potential buyers, arranging meetings with potential buyers, and coordinating due diligence; (v) provide testimony in support of a sale transaction, as necessary; and (vi) assist the Debtors in identifying, negotiating, evaluating and facilitating a debtor in possession financing facility. During its engagement, SSG has worked closely with the Debtors' senior management, including the Chief Restructuring Officer, and other advisors and has become knowledgeable and familiar with the Debtors' capital structure, liquidity needs, and business operations.

11. Following its engagement, SSG has worked with the Debtors and its other advisors to immediately commence the sale process, including drafting a teaser and other marketing materials, establishing a virtual data room, and preparing a form non-disclosure agreement. Thus far, SSG has engaged in discussions with a number of parties interested in the Assets. As of the

Petition Date, 20 parties have signed non-disclosure agreements to conduct diligence with respect to the Assets. As of the Petition Date, the Debtors are engaged in active negotiation with parties that may serve the role of stalking horse bidder for certain of the Assets. The Debtors seek to continue the marketing and negotiation process postpetition in accordance with the Bidding Procedures.

12. During this process, the Debtors will engage with and facilitate diligence for any potential bidders who may be interested in purchasing the Assets in chapter 11. Accordingly, the Debtors believe the Bidding Procedures set forth herein will allow the Debtors to maximize the value of their estates for the benefit of creditors.

**Need For a Timely Process**

13. The facts and circumstances of these Chapter 11 Cases require that the Debtors run an expedited, but robust, sale process as the Debtors simply do not have liquidity to support a protracted sale process and any early indications of interest in a going concern sale will provide the Debtors with information critical to deciding whether to continue or halt the liquidation.

14. The Bidding Procedures and the Debtors' proposed timeline for this sale process are a product of good-faith, arm's length negotiations between the Debtors and the DIP Credit Parties (as defined in the DIP Order[5]) and reflect the best option available for the Debtors to maximize the value of their Assets under the circumstances.

15. As set forth in the Gupta Declaration, the Debtors believe that the Court's approval of Bidding Procedures will generate interest in the Assets and increase the likelihood that the Debtors receive one or more Qualified Bids for their Assets. This, in turn, is more likely to lead

[5] "DIP Order" shall mean the interim or final order, as applicable, approving the postpetition financing in these Chapter 11 Cases.

to a Sale transaction that maximizes the value of the Assets for the benefit of the Debtors, their estates, and their creditors. Accordingly, the Debtors submit that running a Court-approved postpetition marketing and sale process, consistent with the timeline set forth in the Bidding Procedures Order, is necessary under the circumstances and appropriate in the Chapter 11 Cases.

16. Thus, pursuing the Sale in the manner and within the time periods prescribed in the Bidding Procedures is in the best interest of the Debtors' estates and will provide interested parties with sufficient opportunity to participate.

## **Stalking Horse Designation Procedures**

17. As part of their Bidding Procedures, the Debtors seek authority, subject to the terms of the Bidding Procedures Order, to designate one or more stalking horse bids (each, a "Stalking Horse Bid"), pursuant to the procedures set forth in the Bidding Procedures (the "Stalking Horse Designation Procedures") for any or all of the Assets and, in consultation with the Consultation Parties and subject to the express consent of the DIP Agent (as defined in the DIP Order), which consent shall be given in the manner set forth in paragraph 9 of the Bidding Procedures Order, to enter into one or more purchase agreements (each, a "Stalking Horse Agreement") with a potential bidder(s) (each, a "Stalking Horse Bidder"), upon consultation with (i) the DIP Agent; (ii) the Prepetition Term Loan Secured Parties and (iii) any official committee appointed in these Chapter 11 Cases (the "Committee" and together with the DIP Agent and Prepetition Term Loan Secured Parties, the "Consultation Parties"). The Debtors propose to designate any Stalking Horse Bidder **no later than September 28, 2026, at 4:00 p.m. (prevailing Eastern Time)**, which deadline may be extended by the Debtors (after consultation with the Consultation Parties and subject to the express consent of the DIP Agent).

18. The Debtors believe that the ability to enter into a Stalking Horse Agreement with a potential buyer is critical in driving value for the Debtors' estates, as a Stalking Horse Bidder will set the baseline bid in what the Debtors' anticipate will be a robust auction process. Consistent with the market for this kind of process, the Debtors anticipate that it may be necessary to afford a Stalking Horse Bidder certain protections to induce the Stalking Horse Bidder to provide a substantial bid and firm commitment to the Sale.

19. Pursuant to the Bidding Procedures, the Debtors are hereby requesting authority to, upon the designation of a Stalking Horse Bidder and in consultation with the Consultation Parties and subject to the express consent of the DIP Agent, seek approval of an award to a Stalking Horse Bidder with incentives in the form of a break-up fee and reimbursement of documented, actual, and necessary expenses incurred by the Stalking Horse Bidder in connection with submitting its Stalking Horse Bid (collectively, the "Bid Protections"). Those Bid Protections will be described with specificity in a Stalking Horse Notice that will be served on the Stalking Horse Notice Parties (as defined below). As described in the Stalking Horse Designation Procedures, all parties in interest shall have the right to object to the Debtors' entry into a Stalking Horse Agreement on any grounds, including objections to the Bid Protections and the proposed Stalking Horse Order (as defined below).

## Overview Of Bidding Procedures, Notice Procedures And Assignment Procedures

### A. Bidding Procedures.

20. The Bidding Procedures are intended to facilitate a competitive marketing and sale process, including identifying the highest or best offer or offers for the Assets. The Sale may be for all of the Assets or for a portion thereof, to one or more purchasers as potential purchasers may direct and based on the highest or best return for the Debtors' estates.

21. As the Bidding Procedures are attached to the Bidding Procedures Order, they are not restated in their entirety herein. Pursuant to Local Rule 6004-1, certain of the key terms of the Bidding Procedures are highlighted in the chart below.[6]

| **MATERIAL TERMS OF THE BIDDING PROCEDURES AND BIDDING PROCEDURES ORDER** | |
|---|---|
| **Provisions Governing Qualification of Bidders and Qualified Bids** Local Rule 6004-1(c)(i)(A)-(B); Local Rule 6004-1(b)(i)(E), (F), (N) | **Due Diligence, Qualified Bid and Qualified Bidder Requirements are set forth in Sections III, V, and VI of the Bidding Procedures.**<br><br>**A. Due Diligence**<br><br>1. Each person or entity that desires to participate in the Auction process and submit a Qualified Bid must first deliver to SSG (contact information in Sections I and III of the Bidding Procedures) the following:<br><br>• documentation identifying the Prospective Bidder, its principals, and the representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated Sale;<br><br>• an executed confidentiality agreement, in form and substance satisfactory to the Debtors;<br><br>• a statement and other factual support demonstrating to the Debtors and their advisors, in their sole judgment, that the Prospective Bidder has a bona fide interest in purchasing some or all of the Assets; and<br><br>• preliminary proof by the Prospective Bidder of its financial capacity to close a proposed sale transaction, which may include current unaudited or verified financial statements of, or verified financial commitments obtained by, the Prospective Bidder (or, if the Prospective Bidder is an entity formed for the purpose of acquiring the Assets to be sold, the party that will bear liability for a breach by the Prospective Bidder of an asset purchase agreement or other agreement entered into in respect of the sale transaction), the adequacy of which the Debtors and their advisors will determine in their sole judgment.<br><br>2. The Debtors and their advisors shall have the right to disclose on a confidential basis to the DIP Agent, the Prepetition Agents, and their respective advisors each Prospective Bidder's identity, its bid and any related diligence materials.<br><br>3. Any person or entity that delivers the foregoing shall be a "Prospective Bidder." Without the need for any further action, any Stalking Horse Bidder is a Prospective Bidder and a Qualified Bidder.<br><br>4. Upon execution of a valid confidentiality agreement and subject to the other limitations and guidelines set forth herein, the Debtors may grant a Prospective Bidder that the |

[6] Any conflict between the summary of Bidding Procedures set forth in this Motion and the Bidding Procedures, the Bidding Procedures as approved by the Court shall govern in all respects. Capitalized terms used but not defined in this section shall have the meanings ascribed in the Bidding Procedures.

| | |
|---|---|
| | Debtors identify as reasonably likely to become a Qualified Bidder with access to information allowing such Prospective Bidder to conduct due diligence with respect to the potential acquisition of some or all of the Assets. If any Prospective Bidder is (or is affiliated with) a competitor of the Debtors, the Debtors will not be required to disclose to such Prospective Bidder any trade secrets or proprietary information (as determined by the Debtors in their sole discretion), unless the confidentiality agreement executed by such Prospective Bidder is satisfactory to the Debtors and contains provisions sufficient to ensure that such Prospective Bidder will not use such trade secrets or proprietary information for an improper purpose or to gain an unfair competitive advantage.<br><br>5. If the Debtors determine, after consulting with the Consultation Parties, that a Prospective Bidder is unlikely to qualify as a Qualified Bidder or fails to become a Qualified Bidder, then such Prospective Bidder shall have no further right to access due diligence or any other non-public information. The Prospective Bidder shall return or destroy any non-public information the Debtors or their advisors provided to the Prospective Bidder in accordance with the terms of the confidentiality agreement executed by the Debtors and the Prospective Bidder.<br><br>6. All due diligence requests shall be directed to the Debtors' investment banker, SSG.<br><br>**B. Bid Deadline** - Submit Qualified Bid by **October 2, 2026, at 4:00 p.m. (prevailing Eastern Time)**.<br><br>**C. Qualified Bid Requirements**<br><br>1. Identification of Bidder. A Qualified Bid must fully disclose the legal identity of the bidder and any related parties participating in the bidding and Auction process.<br><br>2. Purchased Assets. A Qualified Bid must (a) identify the Assets to be purchased, including any then-known Contracts that are proposed to be assumed and assigned to the bidder and any liabilities to be assumed and (b) set forth the purchase price of the bid.<br><br>3. Form of Consideration.<br><br>• *Credit Bidding*. The DIP Agent and the Prepetition Agents may, to the extent permitted by their applicable loan documents and subject to terms of the DIP Order, as applicable, credit bid all or any portion of the outstanding DIP Obligations, the applicable Prepetition Secured Obligations and Adequate Protection Claims (as defined in the DIP Order) as assertable by such parties, as applicable (the "Credit Bid"). Any Credit Bid shall be a Qualified Bid without the need to provide any Deposit, or to satisfy any other requirement of Section VI.A of the Bidding Procedures, including any Minimum Bid Amount, financing or Adequate Assurance Information requirement, or the agreement to serve as a Backup Bidder, and the DIP Agent and the Prepetition Agents shall each be a Qualified Bidder in connection with such Credit Bid.<br><br>• *Consideration*. Each other bid must include a statement confirming that the bid is based on an all-cash offer, or if a bid includes forms of consideration other than cash, the bidder shall include an analysis or description of the value of such non-cash components, including any supporting documentation, to assist the Debtors and the Consultation Parties in evaluating the bid.<br><br>4. Minimum Bid for Assets. If a Stalking Horse Bidder has been designated, each bid that is not a Stalking Horse Bid must have a value to the Debtors, as determined by the Debtors, in consultation with the Consultation Parties, that is greater than or equal to the |

| | |
|---|---|
| | sum of the value offered under the Stalking Horse Agreement, plus (a) the amount of the Bid Protections and (b) the Minimum Overbid amount (collectively, the "Minimum Bid Amount").<br><br>If the value of a bid relative to any Stalking Horse Bid includes additional non-cash components (such as fewer contingencies than are in such Stalking Horse Agreement), the bidder should include an analysis or description of the value of any such additional non-cash components, including any supporting documentation, to assist the Debtors and the Consultation Parties in better evaluating the competing bid.<br><br>If a Stalking Horse Bidder is not designated pursuant to the Stalking Horse Designation Procedures, the Debtors, in consultation with the Consultation Parties, may set a minimum bid requirement, which shall be considered the Minimum Bid Amount for all purposes hereunder. In such case, the Debtors will notify all Prospective Bidders of the Minimum Bid Amount no later than October 5, 2026 at 5:00 p.m.<br><br>5. Proposed Asset Purchase Agreement. A Qualified Bid must constitute an irrevocable offer and be in the form of an asset purchase agreement reflecting the terms and conditions of the bid (each, a "Proposed Asset Purchase Agreement"). A Proposed Asset Purchase Agreement shall be (a) duly authorized and executed; (b) based on, and marked against, the form asset purchase agreement provided by the Debtors (the "Form APA") or, if a Stalking Horse Bidder has been designated, the Stalking Horse Agreement, to reflect the proposed sale transaction and to show any other proposed modifications to the Form APA or Stalking Horse Agreement, as applicable; (c) specify the proposed purchase price for the Assets in U.S. dollars; and (d) identify any Contracts that, as of the submission of such bid, the Prospective Bidder proposes to be assumed and assigned by the Debtors in connection with the proposed sale transaction.<br><br>6. Financial Information. A Qualified Bid must include (a) a statement that the Prospective Bidder is financially capable of consummating the sale transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement and Proposed Sale Order; (b) sufficient evidence, as determined by the Debtors in their sole discretion, to determine that the Prospective Bidder has, or will obtain, the financial wherewithal to consummate the sale transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement and Proposed Sale Order; and (c) Adequate Assurance Information (as defined below) with respect to any Contracts included or that may be included in the Prospective Bidder's bid, including the identity of any known proposed assignee of the applicable Contracts (if different from the Prospective Bidder), including contact information for such proposed assignee.<br><br>7. Good Faith Deposit. Each Qualified Bid must be accompanied by a good faith deposit (other than a Credit Bid, for which no deposit is required) (each, a "Good Faith Deposit") in the form of cash in an amount equal to 10% of the proposed purchase price for the Assets. The Good Faith Deposit shall be deposited **no later than October 5, 2026 at 3:00 pm (prevailing Eastern Time)** with an escrow agent selected by the Debtors. For the avoidance of doubt, to the extent the purchase price of a Bid is increased at any time or from time to time, whether prior to the commencement of, or during, the Auction (if any), the amount of the required Good Faith Deposit shall automatically increase accordingly (*i.e.*, to equal ten percent (10%) of such increased purchase price), and the corresponding Prospective Bidder shall promptly deposit the amount of such increase into escrow within one (1) business day following such increase. Without limiting the foregoing, if a purchase price is increased in order for a Bid to qualify as a Qualified Bid, the Debtors may condition the applicable Prospective Bidder's participation in the Auction (if any) on such Prospective Bidder depositing the full amount of the then-required Good Faith Deposit into escrow prior to the commencement of the Auction. |

| | |
|---|---|
| | Moreover, the amount of the required Good Faith Deposit shall likewise automatically increase accordingly (*i.e.*, to equal ten percent (10%) of such increased purchase price) with respect to any Successful Bid or Backup Bid, and the corresponding Successful Bidder or Backup Bidder shall promptly deposit the amount of such increase into escrow within one (1) business day following the close of the Auction.<br><br>8. Adequate Assurance. A Qualified Bid must include evidence of the Prospective Bidder's ability to comply with section 365 of the Bankruptcy Code, including providing adequate assurance of such Prospective Bidder's (or any other relevant assignee's) ability to perform future obligations arising under any Contracts included in its bid. The Debtors may require (a) information evidencing the Prospective Bidder's (or any other relevant assignee's) financial wherewithal and willingness to perform under any Contracts included in the bid, which information may include (i) a corporate organizational chart or similar disclosure identifying corporate ownership and control, (ii) financial statements, (iii) tax returns and (iv) annual reports; and (b) the Prospective Bidder's (or any other relevant assignee's) proposed use of any leased premises included in the bid (collectively, the "Adequate Assurance Information"). Adequate Assurance Information must be in a form that will permit its immediate dissemination to Contract counterparties ("Counterparties").<br><br>9. Representations and Warranties (As-Is, Where-Is). Each Qualified Bid must include a written acknowledgement and representation that the Prospective Bidder (a) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its Qualified Bid, (b) has relied solely upon its own or its advisors' independent review, investigation, and/or inspection of any documents and/or the Assets in making its Qualified Bid, (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Prospective Bidder's Proposed Asset Purchase Agreement and (d) the Assets will be conveyed "as is, where is, with all faults," with limited representations and warranties, and no indemnification or guarantees by the Debtors.<br><br>10. Authorization. A Qualified Bid must include evidence of corporate authorization with respect to the submission, execution and delivery of a bid, participation in the Auction and closing the proposed Sale.<br><br>11. Other Requirements. A Qualified Bid must also satisfy, among others (as set forth in Section VI.A.11 of the Bidding Procedures), the following requirements:<br><br>• state that the Prospective Bidder agrees to serve as a backup bidder (a "Backup Bidder") if such bidder's Qualified Bid is selected at the Auction as the next highest or next best bid after the Successful Bid (as defined below) for the applicable Assets (each such bid, a "Backup Bid");<br>• state that the bid represents a binding, good-faith and *bona fide* offer to purchase the applicable Assets and is irrevocable (a) until the selection of the Successful Bid; or, (b) if the bid is selected as a Successful Bid or as a Backup Bid, until the Backup Bid Expiration Date (as defined below);<br>• for any bidder other than the Stalking Horse Bidder, state and acknowledge that the Prospective Bidder shall not be entitled to any bidding protection or payment in connection with the submission of a bid for the Assets or otherwise participating in the sale process; |

| | |
|---|---|
| | • state that the Prospective Bidder is committed to closing the Sale contemplated in its bid as soon as practicable (and in no event later than October 22, 2026);<br>• expressly waive any claim or right to assert any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code in connection with bidding for any of the Assets and/or otherwise participating in the Auction or the sale process;<br>• not contain any financing contingencies of any kind;<br>• state whether the Prospective Bidder intends to offer future employment to any of the Debtors' employees and, if so, to whom;<br>• certify that the Prospective Bidder did not collude with any other bidders and is not otherwise a partnership, joint venture or other entity in which more than one bidder (or any affiliates of a bidder) has a direct or indirect interest, unless consented to in writing by the Debtors;<br>• include a covenant to comply with the terms of the Bidding Procedures and the Bidding Procedures Order; and<br>• contain such other information as may be reasonably requested by the Debtors. |
| **Relief from Bankruptcy Rule 6004(h)**<br>Local Rule 6004-1(b)(iv)(O) | This Motion seeks, and the proposed Bidding Procedures Order approves, relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h). *See* Bidding Procedures Order ¶ 40. |
| **Provisions Providing Bid Protections to Stalking Horse or Initial Bidder**<br>Local Rule 6004-1(c)(i)(C) | The procedures set forth in Section IV of the Bidding Procedures (the "Stalking Horse Designation Procedures") shall apply to the designation of any Stalking Horse Bidder, Stalking Horse Agreement and Bid Protections.<br><br>Subject to the provisions set forth herein, the Bidding Procedures Order, and in consultation with the Consultation Parties, subject to the express consent of the DIP Agent, the Debtors may designate a Stalking Horse Bidder that submits a Qualified Bid acceptable to the Debtors and enter into a Stalking Horse Agreement, subject to higher or otherwise better offers at the Auction, **no later than September 28, 2026 at 4:00 p.m. (prevailing Eastern Time)** which deadline may be extended by the Debtors (after consultation with the Consultation Parties and subject to the express consent of the DIP Agent).<br><br>The Debtors, in consultation with the Consultation Parties, and subject to the express consent of the DIP Agent, may seek approval of one or more bid protections, including, break-up fees and/or reimbursement of expenses, if any, for documented, actual, and necessary expenses incurred by any Stalking Horse Bidder (collectively, the "Bid Protections").<br><br>If the Debtors select a Stalking Horse Bidder, the Debtors shall file a notice (the "Stalking Horse Notice") regarding such selection and any Bid Protections and such Stalking Horse Notice shall be served on (i) the U.S. Trustee, (ii) the Consultation Parties, and (iii) any party that has filed the appropriate notice pursuant to Bankruptcy Rule 2002 requesting notice of all pleadings filed in these Chapter 11 Cases (the "Stalking Horse Notice Parties") with no further or other notice regarding the Stalking Horse Bidder, the Stalking Horse Bid, or the Bid Protections being required. To the extent the Stalking Horse Bid includes any of the Assets located in Canada, the Information Officer appointed in the Debtors' Recognition Proceeding shall be a Stalking Horse Notice Party. Any Stalking Horse Notice shall (a) set forth the identity of the Stalking Horse Bidder (and if the Stalking Horse Bidder is a newly formed entity, then the Stalking Horse Bidder's parent company or sponsor); (b) set forth the amount of the Stalking Horse Bid and any Bid Protections; (c) state whether the Stalking Horse Bidder has any connection to the Debtors other than those that arise from the Stalking Horse Bid; (d) confirm the proposed Bid Protections are consistent with the Bidding Procedures Order; (e) |

| | |
|---|---|
| | attach the purchase agreement finalized with the Stalking Horse Bidder or otherwise summarize the material terms thereof; and (f) set forth the deadline to object to the Stalking Horse Bidder designation.<br><br>Objections to the designation of a Stalking Horse Bidder or any of the terms of a Stalking Horse Bid (a "Stalking Horse Objection") shall (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (c) state, with specificity, the legal and factual bases thereof and (d) be filed with the Court and served on the Objection Notice Parties the later of (i) the deadline to object to the Bidding Procedures Motion and (ii) three business days after the Stalking Horse Notice is filed. If a timely Stalking Horse Objection is filed, the Debtors are authorized to seek an expedited hearing with respect to the Stalking Horse Objection on not less than three (3) calendar days' notice. Absent any timely Stalking Horse Objection, the Court may enter an order approving the Bid Protections set forth in Stalking Horse Notice and the designation of the Stalking Horse.<br><br>Upon filing of the Stalking Horse Notice, any Stalking Horse Agreement executed by the Debtors and the transactions contemplated thereby will be deemed a Qualified Bid for all purposes, and any Stalking Horse Bidder party to a Stalking Horse Agreement executed by the Debtors will be deemed to be a Qualified Bidder.<br><br>Other than as provided by order of the Court, no party submitting a Bid shall be entitled to a break-up fee or expense reimbursement except for the Bid Protections for any Stalking Horse Bidder. Any substantial contribution claims by any bidder are deemed waived. |
| **Modification of Bidding Procedures**<br>Local Rule 6004-1(c)(i)(D) | Section IX of the Bidding Procedures sets forth the Debtors' reservation of rights to, in their reasonable business judgment and after consultation with the Consultation Parties, and in a manner consistent with their fiduciary duties and applicable law, (i) modify these Bidding Procedures, including to, among other things, extend or waive deadlines or other terms and conditions set forth herein, adopt new rules and procedures for conducting the bidding and Auction process so long as any such modifications are disclosed to all Prospective Bidders and Qualified Bidders, as applicable, or (ii) otherwise modify these Bidding Procedures to further promote competitive bidding for and maximizing the value of the Assets, in each case, to the extent not materially inconsistent with these Bidding Procedures or the Bidding Procedures Order; provided that the Debtors shall not, without the express consent of the DIP Agent, extend, waive, or modify any date or deadline set forth in Section II of the Bidding Procedures, or without the express consent of the DIP Agent and the Prepetition Agents (as applicable), modify the Bidding Procedures in any manner that is adverse to the DIP Secured Parties or the Prepetition Secured Creditors. |

| | |
|---|---|
| **Closing with Alternative Back-up Bidders**<br>Local Rule 6004-1(c)(i)(E) | Section VII.C.2 of the Bidding Procedures sets forth the primary requirements with respect to Backup Bids.<br><br>Immediately prior to the conclusion of the Auction, the Debtors will (a) determine in consultation with the Consultation Parties and subject to the prior written consent of the DIP Agent (in its sole discretion), which Qualified Bid, other than any Credit Bid, is the Backup Bid for the applicable Assets and (b) notify all Qualified Bidders at the Auction of the identity of the Backup Bidder and the material terms of the Backup Bid.<br><br>Except as otherwise provided in any Stalking Horse Agreement, a Backup Bid will remain binding on the Backup Bidder until the later of (a) the first business day after the closing of a Sale with the Successful Bidder for the applicable Assets and (b) 30 days after the Sale Hearing (such date, the "Backup Bid Expiration Date"). If the Sale with the Successful Bidder is terminated prior to the Backup Bid Expiration Date, the Backup Bidder will be deemed the new Successful Bidder for the applicable Assets and shall be obligated to consummate the Backup Bid as if it were the Successful Bid at the Auction; *provided* that the Debtors may, in their reasonable business judgment (after providing notice to the Sale Notice Parties) and after consultation with the Consultation Parties and subject to the express consent of the DIP Agent, elect not to pursue the sale transaction contemplated by the Backup Bid. |
| **Provisions Governing the Auction**<br>Local Rule 6004-1(c)(ii) | Section VII.B of the Bidding Procedures sets forth the procedures governing the Auction.<br><br>If the Debtors receive more than one Qualified Bid for the Assets, the Debtors will conduct an Auction for the Assets. If any Stalking Horse Bid is the only Qualified Bid received in respect of the Assets, the Debtors will not conduct an Auction for the Assets and will seek approval of such Stalking Horse Bid at the Sale Hearing. If the Debtors, subject to the express consent of the DIP Agent, determine not to hold an Auction for some or all of the Assets, the Debtors will file and serve a notice stating that the Auction for such Assets has been canceled and providing all other relevant information to the Sale Notice Parties as required by the Bidding Procedures.<br><br>The Auction, if required, will be conducted on **October 6, 2026, at 10:00 a.m**. (prevailing Eastern Time), at either (i) at the offices of Cole Schotz P.C., 500 Delaware Avenue Suite 600 Wilmington, DE 19801, or (ii) virtually or at such other date, time or location as designated by the Debtors, after consulting with the Consultation Parties. If the Debtors conduct the Auction virtually, the Debtors will provide instructions setting forth how to attend the Auction to the participants and other attendees via electronic mail. The Debtors will provide notice (via electronic mail or otherwise) of any change in the date, time or location of the Auction to Qualified Bidders and the Consultation Parties and will cause publication of such change to occur on the Epiq Website (as defined in the Bidding Procedures Order). Any creditor of the Debtors shall be permitted to attend the Auction, subject to other limitations as may be reasonably imposed by the Debtors in accordance with these Bidding Procedures.<br><br>A. Participation. Each participant in the Auction must be (i) a Qualified Bidder, (ii) appear at the Auction, either personally or through a duly authorized representative and (iii) confirm on the record that (A) the participant has not engaged in any collusion with respect to any bid or the Sale Process and (B) any and all Qualified Bids submitted by the participant constitute good faith, binding and *bona fide* offers to purchase the applicable Assets.<br><br>B. Proceedings. The Auction proceedings will (i) be transcribed and/or video recorded and (ii) include open bidding in the presence of all Qualified Bidders, subject to reasonable limitations imposed by a virtual auction platform to be evaluated and determined by the Debtors. |

| | |
|---|---|
| | C. Baseline Bids. Prior to the commencement of the Auction, the Debtors will determine, in their reasonable business judgment (and in consultation with the Consultation Parties and subject to the express consent of the DIP Agent) the highest and/or best Qualified Bid submitted for the Assets (such Qualified Bid, a "Baseline Bid"). Bidding at the Auction shall commence at the amount of the Baseline Bid. **No later than October 5, 2026, at 5:00 p.m.** (prevailing Eastern Time), the Debtors will provide all Qualified Bidders with (a) a notice identifying all the Qualified Bidders and which Qualified Bid is the Baseline Bid; and (b) a copy of the Baseline Bid.<br><br>D. Minimum Overbids. Bidding shall commence at the Baseline Bid. The first overbid at the Auction shall be in an amount not less than the amount of the Baseline Bid plus the Minimum Overbid. In consultation with Consultation Parties, the Minimum Overbid amount will be determined based on the Qualified Bids received and the assets contemplated being sold (the "Minimum Overbid"). At each round of bidding, Qualified Bidders may submit successive bids higher than the Leading Bid (as defined below) from the prior round. During the Auction, the Debtors may, in their reasonable discretion, announce increases or reductions to Minimum Overbids at any time; provided that any reduction of a Minimum Overbid shall be subject to the express consent of the DIP Agent. For the avoidance of doubt, a Credit Bid may be increased at the Auction on a dollar-for-dollar basis by additional credit bid amounts, and no credit bidder shall be required to include cash consideration in any overbid except as required by section 363(k) of the Bankruptcy Code or the DIP Order.<br><br>Except as specifically set forth in the Bidding Procedures, for the purpose of evaluating the value of the consideration provided by any bid subsequent to the Baseline Bid, the Debtors will, at each round of bidding, consider and/or give effect to (a) any Bid Protections payable to any Stalking Horse Bidder under any Stalking Horse Agreement; (b) any additional liabilities to be assumed by a Qualified Bidder under the bid, including whether such liabilities are secured or unsecured; and (c) any additional costs that may be imposed on the Debtors.<br><br>E. Leading Bids. After the first round of bidding and between each subsequent round of bidding, the Debtors will announce the bid that they believe, subject to the prior written consent of the DIP Agent (in its sole discretion), to be the highest or otherwise best offer for the Assets (each such bid, a "Leading Bid") and describe the material terms thereof.<br><br>F. Successful Bids. Immediately prior to the conclusion of the Auction, the Debtors will (i) determine in consultation with the Consultation Parties, and subject to the prior written consent of the DIP Agent (in its sole discretion), which Qualified Bid constitutes the highest or otherwise best bid for the Assets (such bid, a "Successful Bid") and (ii) notify all Qualified Bidders at the Auction of the identity of the bidder that submitted the Successful Bid for the Assets (each such bidder, a "Successful Bidder") and the material terms of the Successful Bid. Notwithstanding anything contained herein to the contrary and for the avoidance of doubt, selection of the Successful Bidder and approval of the ultimate sale transaction or transactions will require the prior written approval of the DIP Agent (in its sole discretion). |

### B. Key Dates and Deadlines.

22. The Debtors propose the following key dates and deadlines for the sale process, certain of which dates and deadlines may be subject to extension in accordance with the Bidding Procedures:[7]

| DEADLINE | EVENT |
|---|---|
| **Two business days after the entry of the Bidding Procedures Order** | Deadline for Debtors to file and serve Sale Notice |
| **Two business days after the entry of the Bidding Procedures Order** | Deadline for Debtors to file and serve Assumption and Assignment Notice |
| **September 25, 2026, at 4:00 p.m. (prevailing Eastern Time)** | Cure Objection Deadline |
| **September 28, 2026, at 4:00 p.m. (prevailing Eastern Time)** | Deadline for Debtors to designate a Stalking Horse Bidder |
| **October 1, 2026, at 4:00 p.m. (prevailing Eastern Time)** | Sale Objection Deadline |
| **October 2, 2026, at 4:00 p.m. (prevailing Eastern Time)** | Bid Deadline |
| **October 6, 2026, at 10:00 a.m. (prevailing Eastern Time)** | Auction |
| **One business day after the conclusion of the Auction** | Deadline for Debtors to file and serve Notice of Auction Results |
| **October 12, 2026, at 4:00 p.m. (prevailing Eastern Time)** | Supplemental Sale Objection Deadline and Adequate Assurance Objection Deadline |
| **October 13, 2026, at 4:00 p.m. (prevailing Eastern Time)** | Debtors' Deadline to Reply to Sale Objections and Supplemental Sale Objections |
| **October 14, 2026, subject to the availability of the Court** | Sale Hearing |
| **October 21, 2026** | Deadline for entry of a recognition order in the Recognition Proceedings (if necessary) |
| **October 22, 2026** | Deadline to consummate approved Sale |

### C. Sale Noticing and Objection Procedures

23. The Bidding Procedures provide the following "Noticing Procedures":

[7] The Debtors reserve the right to change the proposed sale-related deadlines at any time prior to the Bidding Procedures Hearing, subject to the express consent of the DIP Agent; *provided*, *however*, that any modified dates shall not provide parties with any lesser notice or time than the dates set forth in the entered Bidding Procedures Order.

a. **Stalking Horse Order.** As soon as practicable after the Debtors submit the Stalking Horse Order to the Court, the Debtors will cause notice thereof to be served on parties in interest and any Prospective Bidder.

b. **Sale Notice.** Within two (2) business days after entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors shall serve on the Sale Notice Parties and cause to be published on the Epiq Website the Sale Notice.

c. **Sale Objection**. Except objections to the conduct of the Auction, the Successful Bidder or the Backup Bidder (other than the identity of any Stalking Horse Bidder), objections to the sale of the Assets, including (i) any objection to a sale of Assets free and clear of all liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code and (ii) the entry of any Sale Order must be (A) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (B) filed with the Court by **no later than October 1, 2026, at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline"); and (C) served on the Objection Notice Parties (as defined in the Bidding Procedures).

d. **Notice of Determination of Qualified Bids**. The Debtors, in consultation with the Consultation Parties, will make a determination regarding which bids qualify as Qualified Bids and will notify Prospective Bidders whether they have been selected as Qualified Bidders by **no later than October 5, 2026 at 10:00 a.m. (prevailing Eastern Time)**.

**No later than October 5, 2026, at 5:00 p.m. (prevailing Eastern Time)**, the Debtors will provide all Qualified Bidders (including the Stalking Horse Bidder) copies of the Qualified Bid that the Debtors, after consultation with the Consultation Parties and subject to the express consent of the DIP Agent believe is the highest or otherwise best offer for the Assets (the "Baseline Bid").

e. **Auction Results.** One business day after the conclusion of the Auction, the Debtors will file with the Court, serve on parties in interest and cause to be published on the Epiq Website, a notice of the results of the Auction (the "Notice of Auction Results"), which will (A) identify the Successful Bidder(s) and the Backup Bidder; (B) either include a copy of each Successful Bid and the Backup Bid or a summary of the material terms of such bids, or provide instructions for accessing each Successful Bid and the Backup Bid free of charge from the Epiq Website; and (C) set forth the Supplemental Sale Objection Deadline and the date, time and location of the Sale Hearing and any other relevant dates or other information necessary to reasonably apprise the Sale Notice Parties of the outcome of the Auction.

f. **Supplemental Sale Objections.** Following service of the Notice of Auction Results, parties in interest will have an opportunity to object solely with respect to the conduct of the Auction, the Successful Bidder, the Backup Bidder, or the

Sale to the Successful Bidder or the Backup Bidder, in each case other than any Stalking Horse Bidder (each such objection, a "Supplemental Sale Objection"). Any Supplemental Sale Objection must be (i) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (ii) filed with the Court by **no later than October 12, 2026, at 4:00 p.m. (prevailing Eastern Time)** (the "Supplemental Sale Objection Deadline"); and (iii) served on the Objection Notice Parties.

24. The Debtors believe that the Noticing Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, the dates and deadlines identified in paragraph 22 above. Accordingly, the Debtors request that the Court find that the Noticing Procedures are adequate and appropriate under the circumstances and comply with the requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.

**D. Assumption and Assignment Procedures**

25. In connection with the Sale, the Debtors likely will seek to assume and assign to the Successful Bidder (or its designated assignee(s)) one or more Contracts. The Assumption and Assignment Procedures are designed to, among other things, govern the Debtors' provision of Adequate Assurance Information and notice of Cure Costs to applicable Counterparties.[8]

26. Accordingly, the Debtors hereby seek approval of the proposed Assumption and Assignment Procedures set forth below, which are designed to, among other things, (i) outline the process by which the Debtors will serve notice to all Counterparties regarding the proposed assumption and assignment, related Cure Costs, if any, and information regarding the Stalking Horse Bidder's or such other Successful Bidder's adequate assurance of future performance and (ii) establish objection and other relevant deadlines and the manner for resolving disputes relating

[8] For avoidance of doubt, all Cure Costs to applicable Counterparties shall be satisfied by the Successful Bidder (its designee).

to assumption and assignment of executory contacts and unexpired leases. Specifically, the Assumption and Assignment Procedures are as follows:

a. **Potential Assumption and Assignment Notice**. Two business days after the entry of the Bidding Procedures Order, the Debtors will file with the Court and serve on each Counterparty to a Contract that may be assumed in connection with any Sale an Assumption and Assignment Notice, which will (i) identify the applicable Contracts; (ii) list the Debtors' good-faith calculation of Cure Costs with respect to each such Contract; (iii) expressly state that assumption or assignment of a Contract is not guaranteed and is subject to Court approval; and (iv) prominently display the deadlines to file Cure Objections and Adequate Assurance Objections (each as defined below). The Assumption and Assignment Notice shall also be served on each Counterparty listed therein via first class mail.

b. **Assumption and Assignment Objections**.

  i. Cure Objection Deadline. Any Counterparty to a Contract that wishes to object to the Debtors' proposed Cure Costs or to any Stalking Horse Bidder's proposed form of adequate assurance of future performance (each such objection, a "Cure Objection") shall file with the Court and serve on the Objection Notice Parties its Cure Objection, which must state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, by **no later than September 25, 2026, at 4:00 p.m. (prevailing Eastern Time)** (the "Cure Objection Deadline").

  ii. Resolution of Cure Objections. The Debtors, any Stalking Horse Bidder or Successful Bidder, and the objecting Counterparty shall first confer in good faith to attempt to resolve the Cure Objection without Court intervention. If the parties are unable to consensually resolve the Cure Objection prior to the commencement of the Sale Hearing, the Court shall make all necessary determinations relating to the applicable Cure Costs and Cure Objection at a hearing scheduled pursuant to the following paragraph. If a Cure Objection is resolved in a manner that is not reasonably acceptable to the Debtors or the Successful Bidder, whether or not such resolution occurs prior to or after the closing of the Sale, the Debtors, any Stalking Horse Bidder or, as applicable, the Successful Bidder may determine that any Contract subject to such resolved Cure Objection will no longer be assumed and assigned pursuant to the Sale (subject to the terms of the Sale). All other objections to the proposed assumption and assignment of the Debtors' right, title and interest in, to and under a Contract will be heard at the Sale Hearing.

  iii. Adjournment. If a timely filed Cure Objection cannot otherwise be resolved by the parties, the Cure Objection may be heard at the Sale

Hearing, or, at the Debtors' option, be adjourned to a subsequent hearing, with notice to the party having filed the Cure Objection (each such Cure Objection, an "Adjourned Cure Objection"). An Adjourned Cure Objection may be resolved after the closing date of the Sale. Upon resolution of an Adjourned Cure Objection and the payment of the applicable cure amount, if any, the applicable Contract that was the subject of such Adjourned Cure Objection shall, as applicable, be deemed assumed and assigned to the Successful Bidder as of the closing date of the Sale.

iv. Failure to Timely Object. If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Cure Objection, the Counterparty forever shall be barred from asserting any objection with regard to the cost to cure any defaults under the applicable Contract. The Cure Costs set forth in the applicable Assumption and Assignment Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the Contract and satisfy the requirements of section 365(b) of the Bankruptcy Code, and the Counterparty to the Contract shall be bound by and deemed to have consented to the Cure Costs.

v. Adequate Assurance Objection Deadline. Any Counterparty to a Contract that wishes to object to the proposed assumption and assignment of the Contract, the subject of which objection is a Successful Bidder's (other than any Stalking Horse Bidder's) or any other relevant assignee's proposed form of adequate assurance of future performance (each such objection, an "Adequate Assurance Objection"), shall file with the Court and serve on the Objection Notice Parties an Adequate Assurance Objection, which must state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, **by October 12, 2026, at 4:00 p.m. (prevailing Eastern Time)** (the "Adequate Assurance Objection Deadline" and, together with the Cure Objection Deadline, the Sale Objection Deadline and the Supplemental Sale Objection Deadline, the "Objection Deadlines").

vi. Resolution of Adequate Assurance Objections. The Debtors and the objecting Counterparty shall first confer in good faith to attempt to resolve the Adequate Assurance Objection without Court intervention. If the parties are unable to consensually resolve the Adequate Assurance Objection prior to the commencement of the Sale Hearing, the Adequate Assurance Objection and all issues of adequate assurance of future performance of the Successful Bidder (or any other relevant assignee) shall be determined by the Court at the Sale Hearing or, at the option of the Debtors and the Successful Bidder, be adjourned to a subsequent hearing, with notice to the party having filed the Adequate Assurance Objection.

vii. Failure to Timely Object. If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Adequate Assurance Objection, the Counterparty shall be forever barred from asserting any objection to the assumption and/or assignment of the applicable Contract with regard to adequate assurance of future performance. The Successful Bidder (or any other relevant assignee) shall be deemed to have provided adequate assurance of future performance with respect to the Contract in accordance with Bankruptcy Code section 365(f)(2)(B) and, if applicable, Bankruptcy Code section 365(b)(3), notwithstanding anything to the contrary in the Contract or any other document.

c. **Notice of Assumed Contracts**. As soon as reasonably practicable after the closing of the Sale, the Debtors will file with the Court, serve on the applicable Counterparties and cause to be published on the Epiq Website, a notice containing the list of Contracts that the Debtors assumed and assigned pursuant to the asset purchase agreement with the Successful Bidder.

d. **Reservation of Rights**. The inclusion of a Contract or specification of any Cure Costs with respect to any Contract on any Assumption and Assignment Notice or any Notice of Auction Results, shall not constitute or be deemed a determination or admission by the Debtors, the Successful Bidder or any other party that such Contract is an executory contract or an unexpired lease within the meaning of the Bankruptcy Code, and shall not be a guarantee that such Contract ultimately will be assumed or assigned. The Debtors reserve all of their rights, claims and causes of action with respect to each Contract listed on the aforementioned notices.

## Relief Requested

27. By this Motion, pursuant to sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1, the Debtors request entry of the following:

a. the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, granting the following relief:

(i) approving the Bidding Procedures, substantially in the form attached to the Bidding Procedures Order as **Exhibit 1**, to be used in connection with one or more Sales of all, substantially all, or a portion of the Debtors' Assets;

(ii) authorizing the Debtors to designate a Stalking Horse Bidder and provide Bid Protections in accordance with the Stalking Horse Designation Procedures;

(iii) scheduling (A) the Auction of the Assets **no later than October 6, 2026, at 10:00 a.m. (prevailing Eastern Time)** and (B) the Sale Hearing to consider approval of the proposed Sale **no later than October 14, 2026,** subject to the availability of the Court;

(iv) approving the Sale Notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2**;

(v) approving the Assumption and Assignment Procedures;

(vi) approving the Assumption and Assignment Notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3**; and

(vii) granting related relief; and

b. a Sale Order, granting the following relief:

(i) authorizing the sale of the Assets free and clear of all liens, claims, interests and encumbrances, except certain permitted encumbrances and assumed liabilities as determined by the Debtors and the Successful Bidder, with liens to attach to the proceeds of the Sale with, subject to the challenge period set forth in the DIP Order, the DIP Liens, the Adequate Protection Liens, the Prepetition Liens, and any Permitted Prior Liens (all as defined in the DIP Order) to attach to the proceeds of the Sale with the same validity, extent, and priority as they attached to the Assets;

(ii) authorizing the assumption and assignment of certain Contracts in connection with a Sale; and

(iii) granting related relief.

## Approval of the Relief Requested is Warranted and in the Best Interests of the Debtors and Their Stakeholders

### A. The Proposed Bidding Procedures Are Fair, Appropriate and Should Be Approved

28. The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by the estate. *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that a debtor had a fiduciary duty to maximize and

protect the value of the estate's assets); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (recognizing that a main goal of any proposed sale of property of a debtor's estate is to maximize value). Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 536-37 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing the benefit of sale procedures that "encourage bidding and . . . maximize the value of the debtor's assets").

29. Here, the Bidding Procedures meet this standard because the proposed timeframe will promote competitive bidding while taking into account the Debtors' liquidity position, and the Debtors believe that the auction process and time periods set forth in the Bidding Procedures are reasonable and will provide interested parties with sufficient time and information necessary to formulate a bid to purchase all or substantially all of the Assets. The proposed timeline will facilitate a fair and open sale process and will position the Debtors to maximize the value received for the Assets.

30. The facts and circumstances of these Chapter 11 Cases require that the Debtors run an expedited, but robust, sale process. Speed and certainty are critical here, especially because the Debtors simply do not have liquidity to support a protracted sale process.

31. More importantly, and as set forth in the Gupta Declaration, the Debtors believe that the Court's approval of Bidding Procedures at this time will generate interest in the Assets and increase the likelihood that the Debtors receive one or more Qualified Bids for its Assets in a

timely manner. This, in turn, is more likely to lead to a Sale transaction that maximizes the value of the Assets for the benefit of the Debtors, their estates, and their creditors. Accordingly, the Debtors submit that running a Court-approved postpetition marketing and sale process, consistent with the timeline set forth in the Bidding Procedures Order, is necessary under the circumstances and appropriate in these Chapter 11 Cases.

32. The proposed Bidding Procedures provide interested parties with 45 days after the Petition Date to continue diligence and submit a qualified bid, and with 57 days from the Petition Date to the proposed Sale Hearing. The timeline set forth in the Bidding Procedures is sufficient to provide these potential purchasers with an adequate amount of time to diligence the assets and submit bids.

33. Additionally, the Bidding Procedures will allow the Debtors to conduct the Auction in a transparent manner that will encourage participation by financially capable bidders with demonstrated ability to consummate a timely Sale. Specifically, the Bidding Procedures contemplate an open auction process with no barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid. Accordingly, the Bidding Procedures should be approved because, under the circumstances, they are reasonable, appropriate and in the best interests of the Debtors, their estates and all parties in interests.

34. Courts in this District routinely approve procedures substantially similar to the proposed Bidding Procedures. *See, e.g.*, *In re Simply Interior Homes, LLC*, Case No. 26-10922 (CTG) (Bankr. D. Del. June 25, 2025) (sale hearing scheduled 63 days after the petition date); *In re Charter School Capital, Inc.*, Case No. 25-11016 (CTG) (Bankr. D. Del. July 2, 2025) (sale hearing held 47 days after the petition date); *In re The Rockport Company, LLC*, et al. Case No.

23-10774 (BLS) (Bankr. D. Del. July 25, 2023) (sale hearing held 41 days after the petition date); *In re Enjoy Tech., Inc.*, Case No. 22-10580 (JKS) (Bankr. D. Del. Jul. 26, 2022) (sale hearing held 43 days after the petition date); *In re Gold Standard Baking, LLC*, Case No. 22-10559 (JKS) (Bankr. D. Del. Jul. 8, 2022) (sale hearing held 42 days after the petition date); *In re Makeup Liquidating Holdings, LLC*, Case No. 22-10050 (CSS) (Bankr. D. Del. Jan. 28, 2022) (sale hearing held 35 days after the petition date); *In re BBGI US, Inc.*, Case No. 20-11785 (BLS) (Bankr. D. Del. Aug. 3, 2020) (sale hearing held 37 days after the petition date); *In re CR Holding Liquidating, Inc.*, Case No. 19-10210 (LSS) (Bankr. D. Del. Feb. 21, 2019) (sale hearing held 31 days after the petition date); *In re Lucky Brand Dungarees, LLC*, Case No 20-11768 (CSS) (Bankr. D. Del July 30, 2020) (approving bidding procedures, with designated stalking horse bid protections, including bid deadline 8 days after entry of bidding procedures order and sale hearing 40 days after the petition date); *In re Templar Energy LLC*, Case No 20-11441 (BLS) (Bankr. D. Del. June 23, 2020) (approving bidding procedures with bid deadline 13 days after entry of bidding procedures order and sale hearing 43 days after the petition date); *In re Sustainable Restaurant Holdings, Inc.*, Case No 20-11087 (JTD) (Bankr. D. Del. June 19, 2020) (approving bidding procedures with bid deadline 19 days after entry of bidding procedures order and sale hearing 64 days after the petition date); *In re Golfsmith Int'l Holdings, Inc.*, Case No 16-12033 (LSS) (Bankr. D. Del. Oct. 6, 2016) (approving bidding procedures with a bid deadline 11 days after entry of order and auction scheduled for 13 days after entry of order).[9]

**B. The Proposed Bid Protections Have Sound Business Purposes and Should Be Approved.**

[9] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

35. As described above, the Bid Protections, if they prove necessary for the entry into any Stalking Horse Agreement, include break-up fees and reimbursement of reasonable, documented expenses. The Debtors believe that the Bid Protections may be necessary to encourage prospective bidders to become a Stalking Horse Bidder and enter into a binding Stalking Horse Agreement. The Debtors believe that the presence of a Stalking Horse Bidder will set a floor for the value of the Assets and attract other potential buyers to bid for the Assets, thereby maximizing the realizable value of the Assets for the benefit of the Debtors' estates, their creditors, and all other parties-in-interest. A Stalking Horse Bidder, if secured, would further benefit the Debtors' estates by providing a measure of transaction certainty and demonstrating to employees, vendors, customers, and other stakeholders the viability of a going-concern sale of all or a portion of the business.

36. Approval of the Bid Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context. Courts have identified at least two instances in which bid protections may benefit the estate. *First*, a break-up fee may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 537. *Second*, if the availability of a break-up fee was to "induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*; *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party

to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

37. In *O'Brien*, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee:

> a. the presence of self-dealing or manipulation in negotiating the break-up fee;
>
> b. whether the fee hampers, rather than encourages, bidding;
>
> c. the reasonableness of the break-up fee relative to the purchase price;
>
> d. whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;
>
> e. the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;
>
> f. the correlation of the fee to a maximum value of the debtor's estate;
>
> g. the support of the principal secured creditors and creditors' committees of the break-up fee;
>
> h. the benefits of the safeguards to the debtor's estate; and
>
> i. the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See O'Brien*, 181 F.3d at 536.

38. While none of the factors are dispositive, an application of the facts to several of such factors supports the approval of the Bid Protections. In particular, the Bid Protections are necessary to preserve the value of the Debtors' estates because they may enable the Debtors to secure an adequate floor for the Assets and to therefore insist that competing bids be materially higher or otherwise better than any Stalking Horse Agreement—a clear benefit to the Debtors'

estates. Further, a Stalking Horse Bidder may not agree to act as a "stalking horse" without the Bid Protections, given the substantial time and expense that would be incurred in connection with entering into definitive documentation and the risk that it will be outbid at the Auction. Without the Bid Protections, the Debtors might lose the opportunity to obtain the highest or otherwise best offer for the Assets and would certainly lose any downside protection that would be afforded by the existence of a Stalking Horse Bidder. The bid of a Stalking Horse Bidder would send a message to all potential bidders that the Assets are worth at least as much as any Stalking Horse Bid. Therefore, without the benefit of the bid of a Stalking Horse Bidder (*i.e.*, a bid providing the floor), the bids received at auction for the Assets could be substantially lower than any bid offered by a Stalking Horse Bidder.

39. "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable." *In re Integrated Res., Inc.*, 147 B.R. at 659. The Debtors do not believe that the Bid Protections will stifle bidding. To the contrary, the Debtors believe that such bid protections will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders." *Id.* at 662.

40. Here, the bid of a Stalking Horse Bidder would serve all three functions. *First*, a Stalking Horse Bidder might not enter into a Stalking Horse Agreement without the Bid Protections. *Second*, pursuant to the Bidding Procedures, any bidder that wishes to participate in the Auction must submit an offer that is higher or otherwise better than the bid of any Stalking Horse Bidder. *Third*, the bid of a Stalking Horse Bidder could attract additional bidders because, among other things, additional bidders would be able to save considerable time and expense because they could use many of the documents that a Stalking Horse Bidder may negotiate,

including, among other things, any Stalking Horse Agreement and the schedules thereto, in making their bid. In sum, if all, substantially all, or portion of the Assets are sold to a Successful Bidder other than a Stalking Horse Bidder, the Sale likely will be the result of a Stalking Horse Bidder's crucial role as an initial bidder generating interest in the Assets and establishing a minimum acceptable price and offer against which other parties can bid.

41. In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. 'When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible.'" *Id*. (citation omitted).

42. Here, the Bidding Procedures would authorize the Debtors to file a Stalking Horse Notice, provide an opportunity for parties to object, and, if any objections are not resolved, allow a hearing on an expedited basis to approve the Stalking Horse Bidder and Bid Protections in an amount to be set forth in such Stalking Horse Notice.

### C. Approval of a Sale of the Assets Is Warranted Under Section 363 of the Bankruptcy Code.

43. Ample authority exists for approval of the Sale contemplated by this Motion. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of a debtor's estate, courts have approved the authorization of a sale of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v.*

*McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983).

44. Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (i) whether a sound business justification exists for the sale; (ii) whether adequate and reasonable notice of the sale was provided to interested parties; (iii) whether the sale will produce a fair and reasonable price for the property; and (iv) whether the parties have acted in good faith. *See In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)). Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. at 656.

### 1. The Debtors Have Demonstrated a Sound Business Justification for the Sale of the Assets.

45. A sound business purpose for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders. *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 148 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1070-71; *In re Food Barn Stores, Inc.*, 107 F.3d at 564-65 (recognizing the paramount goal of any proposed sale of property of estate is to maximize value).

46. As set forth above, a strong business justification exists for the sale of all, substantially all, or a portion of the Assets as described herein. An orderly and expeditious sale of the Assets is critical to maximizing the value of the Debtors' estates and recoveries for the Debtors' economic stakeholders.

### 2. Noticing Procedures Are Reasonable and Appropriate.

47. Bankruptcy Rules 2002 and 6004 require the Debtors to notify creditors of the proposed sale, provide a description of the Assets and disclose the time and place of the Auction, the terms and conditions of any proposed Sale, and the Objection Deadlines. *See* Fed. R. Bankr. P. 2002(a), 2002(c), 6004(a). The Noticing Procedures described herein are reasonably calculated to provide all of the Debtors' known creditors and all other parties-in-interest with adequate and timely notice of, among other things, the proposed Sale, the Bidding Procedures, the Stalking Horse Designation Procedures, the Auction, and the Sale Hearing. Further, publishing notice as described in paragraph 23 above is designed to capture any creditors and parties-in-interest not currently known to the Debtors. Accordingly, the Debtors request that the Court approve the Noticing Procedures described herein and in the Bidding Procedures Order.

### 3. The Proposed Sale Will Yield a Fair and Reasonable Purchase Price for the Assets.

48. As set forth above, the Debtors believe that any Sale governed by the Bidding Procedures will yield a fair and reasonable price for the Assets. The Bidding Procedures were designed to facilitate a competitive bidding process.

49. The Debtors also constructed the Bidding Procedures to promote transparency, good faith and fairness throughout the entire Sale Process. The Bidding Procedures provide an appropriate framework for the Debtors to review, analyze and compare bids for the Assets and to engage with bidders on an arm's-length basis to work to improve the quality of their bids for the benefit of all parties-in-interest.

50. A Sale governed by the Bidding Procedures undoubtedly will serve the important objectives of obtaining not only a fair and reasonable purchase price for the Assets, but also the

highest or best value for the Assets. This is a critical feature of the Bidding Procedures, which will inure to the benefit of all parties-in-interest in these Chapter 11 Cases.

**4. The Bidding Procedures Ensure that the Sale Process is Conducted in Good Faith and that the Ultimate Purchaser of the Applicable Assets is Entitled to the Protections Afforded by Section 363(m) of the Bankruptcy Code.**

51. Section 363(m) of the Bankruptcy Code is designed to protect the sale of a debtor's assets to a good-faith purchaser. Specifically, section 363(m) provides the following:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) of the Bankruptcy Code fosters the "policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely." *In re Abbotts Dairies*, 788 F.2d at 147; *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal.").

52. While the Bankruptcy Code does not define "good faith," the Third Circuit has held that indicia of bad faith typically include "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Abbotts Dairies*, 788 F.2d at 147 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)) (other citations omitted); *see also Kabro Assoc. of West Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997).

53. In other words, a party would have to show fraud or collusion between the buyer and the debtor in possession, the trustee or other bidders to demonstrate a lack of good faith. *See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.),* 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders") (quoting *In re Rock Indus. Mach Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)). Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, with a focus on the "integrity of [a bidder's] conduct in the course of the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d at 1998).

54. The Debtors submit that any Successful Bidder will be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code. As set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process. In addition, SSG is an independent investment banker retained by the Debtors for the purpose of exploring strategic alternatives, marketing the Debtors' business, soliciting bids, and negotiating the terms of a potential Sale. Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale of the Assets. Any purchase agreement with a Successful Bidder executed by the Debtors will be negotiated at arm's-length and in good faith by sophisticated parties represented by competent counsel. Accordingly, the Debtors seek a finding that any Successful Bidder (including any Stalking Horse Bidder) is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

55. Based on the foregoing, the Debtors submit that they have demonstrated that the proposed Sale is a sound exercise of the Debtors' business judgment and should be approved as a good faith transaction.

**D. A Sale of the Assets Free and Clear of Liens, Claims, Interests and Encumbrances Is Appropriate under Section 363(f) of the Bankruptcy Code.**

56. A free and clear sale is a prerequisite to ensuring that the Debtors are able to attract the best and highest offers and achieve a value-maximizing transaction in these Chapter 11 Cases for the benefit of the Debtors and their stakeholders.

57. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of all liens, claims, interests and encumbrances of an entity other than the estate if any one of the following conditions is met:

a. applicable non-bankruptcy law permits sale of such property free and clear of such interest;

b. such entity consents;

c. such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

d. such interest is in *bona fide* dispute; or

e. such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same);

58. The Debtors anticipate that any Sale they elect to pursue will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code to permit a "free and clear" sale of the applicable Assets. As an initial matter, the DIP Secured Parties, who are secured by liens

on substantially all of the Assets and are the only secured party in these Chapter 11 Cases, have already consented to the terms of the Bidding Procedures, and subject to the Bidding Procedures, will be an active participant in the sale process. The Debtors are proceeding in these Chapter 11 Cases on a consensual basis with the DIP Secured Parties, who have, among other things, extensive consultation rights and certain express consent rights as described herein.

59. Accordingly, the Debtors request that the Court authorize the sale of the Assets free and clear of any liens, claims, interests and encumbrances, to the fullest extent permitted by section 363(f) of the Bankruptcy Code.

**E. The Debtors' Assumption and Assignment of Executory Contracts and Unexpired Leases Are Appropriate under Section 365 of the Bankruptcy Code.**

60. Section 365(a) of the Bankruptcy Code provides that a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or an unexpired lease. *See, e.g., In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of a lease "will be a matter of business judgment . . . ."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice). In this context, the business judgment test only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).

61. Any proposed Sale will provide a Successful Bidder with the opportunity to designate certain Contracts for assumption and assignment. Assumption of any Contracts is an exercise of the Debtors' sound business judgment because the transfer of Contracts in connection with a Sale is an essential element in the Debtors' ability to maximize the value of the Assets—and particularly so when a Contract is integral to the ownership or operation of the Assets to be acquired. Further, the ability to assume and assign Contracts will increase the likelihood that the Debtors will be able to sell the Assets as a going concern, thereby avoiding needless value-destruction through a liquidation.

62. The consummation of any Sale involving the assignment of a Contract will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code. Section 365(b)(1) requires that the Debtors either cure, or provide adequate assurance that they will promptly cure, any outstanding defaults under the Contracts to be assumed. *See* 11 U.S.C. § 365(b)(1). The Debtors' assumption and assignment of any Contracts will be dependent upon payment of Cure Costs and effective only upon the closing of a Sale. As described with specificity herein, subject to the Court's approval, the Debtors will file with the Court and serve on each Counterparty an Assumption and Assignment Notice setting forth the Debtors' good-faith calculation of the Cure Costs for each Contract that could be assumed in connection with a Sale. Counterparties will have an opportunity to raise any Cure Objections in advance of the Sale Hearing.

63. Section 365(f) of the Bankruptcy Code requires, in part, that the assignee of any executory contract provide "adequate assurance of future performance . . . whether or not there has been a default in such contract." 11 U.S.C. § 365(f)(2). While the Bankruptcy Code does not define "adequate assurance," courts have held that what constitutes "adequate assurance" should

be determined by "a practical, pragmatic construction based upon the facts and circumstances of each case." *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (quoting *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)); *see also In re Alipat, Inc.*, 36 B.R. 274, 276-77 (Bankr. E.D. Mo. 1984) (recognizing that the term adequate assurance "borrowed its critical language . . . from Section 2-609 of the Uniform Commercial Code" which "suggest[s] that adequate assurance is to be defined by commercial rather than legal standards . . . [and] factual considerations"). While no single standard governs every case, adequate assurance "will fall considerably short of an absolute guarantee of performance." *In re Carlisle Homes, Inc.*, 103 B.R. at 538 (citations omitted); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).

64. Adequate assurance may be provided by demonstrating, among other things, the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that industrial expertise, past success in running a similar business and financial wherewithal satisfied the adequate assurance requirement of section 365 of the Bankruptcy Code).

65. The Bidding Procedures expressly specify that for a bid to qualify as a "<u>Qualified Bid</u>," a Prospective Bidder must include with its bid Adequate Assurance Information regarding the Prospective Bidder's (or any other relevant assignee's) ability to perform the applicable obligations under any Contracts that may be included in the bid. The Debtors will furnish all available Adequate Assurance Information to the relevant Counterparties as soon as reasonably possible following their receipt of such information, upon such Counterparty's request. Finally, any Counterparty that is dissatisfied with the content or quality of any relevant Adequate

Assurance Information will have an opportunity to request additional information from the Debtors and, if necessary, lodge an Adequate Assurance Objection in advance of the Sale Hearing. In light of the foregoing, the Debtors' assumption and assignment of any Contracts in accordance with the Assumption and Assignment Procedures would satisfy the requirements of section 365 of the Bankruptcy Code and should be approved.

66. Finally, to facilitate the assumption and assignment of Contracts in furtherance of maximizing the value of the Assets, the Debtors also request that the Court find that any anti-assignment provision included in any Contract, whether such provision expressly prohibits, or has the effect of restricting or limiting assignment of a Contract, is unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.[10]

**F. Requests for Immediate Relief & Waiver of Stay.**

67. Pursuant to Bankruptcy Rules 6004(h) and 6006(d), the Debtors seek a waiver of any stay of the effectiveness of the Bidding Procedures Order, any Sale Order, any Stalking Horse Order, any order authorizing the assumption or assumption and assignment of a Contract in connection with a Sale, and any other order entered by this Court in connection with the Sale. Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f)

[10] Section 365(f)(1) provides in pertinent part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease." 11 U.S.C. § 365(f)(1). Further, section 365(f)(3) provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

is stayed until the expiration of 14 days after entry of the order unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

68. The relief requested herein is necessary and appropriate to maximize the value of the Assets for the benefit of the Debtors' economic stakeholders. Given the Debtors' precarious financial condition and limited cash runway, the relief requested herein should be granted and effective as soon as practicable. Any delay in the Sale Process could jeopardize the Debtors' chapter 11 strategy and the ability of the Debtors to consummate a value-maximizing transaction. Accordingly, the Debtors submit that ample cause exists to justify waiving the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), in each case, to the extent that such stay applies to the relief requested herein.

## **Notice**

69. Notice of this Motion has been or will be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) counsel to the Prepetition Secured Parties and the DIP Secured Parties; (v) the holders of the thirty (30) largest unsecured claims against the Debtors' estates on a consolidated basis; (vi) all persons and entities known by the Debtors to have asserted any lien on or encumbrance with respect to the Assets (for whom identifying information and addresses are available to the Debtors); (vii) the Delaware Secretary of State; (viii) the Securities and Exchange Commission; (ix) the Delaware State Treasury; (x) the attorneys general in all states in which the Debtors conduct business; and (xi) any other party entitled to notice pursuant to Bankruptcy Rule 2002 or order of the Court. The Debtors respectfully submit that no further notice of this Motion need be provided.

[*Remainder of Page Intentionally Left Blank*]

## Conclusion

WHEREFORE, the Debtors respectfully request that the Court: (i) enter the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**; (ii) after the Sale Hearing, enter the Sale Order granting the relief requested in the Motion; and (iii) grant such other and further relief to the Debtors as the Court may deem proper.

Dated: August 19, 2026
Wilmington, Delaware

**COLE SCHOTZ P.C.**


*/s/ Justin R. Alberto*
Justin R. Alberto (No. 5126)
Stacy L. Newman (No. 5044)
Carol E. Thompson (No. 6936)
500 Delaware Avenue, Suite 600
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
Email: jalberto@coleschotz.com
snewman@coleschotz.com
cthompson@coleschotz.com

Seth Van Aalten (*pro hac vice*- pending)
Sarah A. Carnes (*pro hac vice* pending)
Michael A. Solimani (*pro hac vice* pending)
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
Email: svanaalten@coleschotz.com
scarnes@coleschotz.com
msolimani@coleschotz.com

*Proposed Counsel for Debtors*
*and Debtors in Possession*