**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BFG Supply Co., LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 26-11284 (___)<br><br>(Joint Administration Requested) |

**DECLARATION OF ADAM ZALEV IN SUPPORT OF THE**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Adam Zalev, Chief Restructuring Officer of BFG Supply Co., LLC and certain of its affiliates, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), hereby declare under penalty of perjury:

1. I am the Founding Member and Managing Director of Reflect Advisors LLC ("Reflect") and serve as the Chief Restructuring Officer (the "CRO") of the Debtors. I was appointed CRO on July 22, 2026. The Debtors engaged Reflect in July 2026 to provide such interim management services and to date, in accordance with our engagement letter, I have been assisted by other members of the Reflect team. Reflect is proposed to be retained as restructuring advisor in these chapter 11 cases.

2. I submit this declaration (this "Declaration") to assist the Court and parties-in-interest in understanding the Debtors, their businesses, and the circumstances leading to these chapter 11 cases, and in support of the Debtors' voluntary petitions for relief under chapter 11 of

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BFG Supply Co., LLC (6660); Bamboo Purchaser, Inc. (1173); BFG Purchaser Parent, Inc. (2451); BFG Supply Holdings, Inc. (4070); BFG Holdings I, Inc. (1502); BFG Supply Canada Holdings, Inc. (9737); De Cloet Greenhouse Mfg. Ltd. (N/A); BFG Kalamazoo, LLC (0121); BFG Logistics, LLC (4172); L&L Nursery Supply, Inc. (9972); Gard'N-Wise Distributors, Inc. (8418); International Greenhouse Contractors, LLC (7313); Greenhouse Solutions, LLC (1860); Greenhouse Contracting Services, LLC (3738); Green-Tek, LLC (8749); GROSouth, Inc. (4231); BFG VG Supply Acquisition, LLC (0219). The Debtors' service address in these chapter 11 cases is 4660 East Paris Avenue SE, Grand Rapids, Michigan 49512.

title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date") and in support of the first day motions filed contemporaneously herewith (collectively, the "First Day Motions").

3. Prior to founding Reflect in 2023, I was a Senior Managing Director of FTI Consulting, Inc. ("FTI") for six years. Prior to joining FTI, I held progressively more senior roles, culminating as a Managing Director, at Alvarez & Marsal ULC, where I practiced for nine years. Reflect is a boutique financial advisory and restructuring practice whose professionals have been involved in numerous formal and informal restructuring mandates, including many in the retail, consumer and wholesale distribution industries. During my career, I have had extensive experience in chapter 11 cases and, in particular, chapter 11 cases in the consumer products, wholesale distribution and retail industries. I have also acted in numerous cross-border consumer products and retail bankruptcy cases, principally where U.S. corporate owners controlled Canadian operating subsidiaries. In connection therewith, I have been personally involved in numerous consumer products, wholesale distribution and retail bankruptcy cases where liquidation consultants were retained to conduct going-out-of-business and other liquidation sales. My personal, recent consumer products and wholesale distribution experience includes, but is not limited to, cases such as Simply Interior Homes, American Signature, The Hudson's Bay Company (Canada), Bed Bath & Beyond, Christmas Tree Shops, Old Time Pottery, Toys R Us, Sears, Target Canada, Ben Moss Jewelers, and others.

4. Since commencing its engagement, Reflect has worked closely with the Debtors' management team and other key employees of the Debtors, including in the finance, operations, and human resources departments, to understand the Debtors' cash flows and operations, evaluate restructuring options, and prepare for these chapter 11 cases. Since my appointment as CRO, I and

the Reflect team have conducted an intensive review of the Debtors' businesses, finances, and operational situation to become familiar with the matters described herein.

5. Except as otherwise indicated herein, the statements in this Declaration are based on: (i) my personal knowledge of, and familiarity with, the Debtors' operations, finances, and restructuring efforts; (ii) my review of relevant documents and information provided to me by employees of or advisors to the Debtors; (iii) my opinion based on my experience and knowledge of the Debtors' operations and financial and business affairs; (iv) information received from the Debtors' employees or advisors working directly with me or under my supervision; and/or (v) the Debtors' records maintained in the ordinary course of business. I am authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth herein.

6. I am not being compensated specifically for this testimony other than through payments received by Reflect as a professional proposed to be retained by the Debtors. I am over the age of 18 years.

7. This Declaration is organized into two sections as follows: Part I provides background information regarding the Debtors, including their history and formation, the Debtors' business and corporate structure, their capital structure, and the circumstances that led to these chapter 11 cases. Part II describes the relief sought in the First Day Motions and sets forth the factual basis for the Court to grant such relief on an emergency basis.

* * * *

# PART I: BACKGROUND INFORMATION

## A. Introduction and Business Overview

8. The Debtors operate one of North America's leading wholesale distribution platforms serving the professional green industry. Over more than five decades, the business has evolved from a regional horticultural supplier into a diversified distributor of lawn and garden products, greenhouse supplies, nursery products, controlled-environment agriculture products, greenhouse structures, and related horticultural equipment. Through a combination of organic growth and strategic acquisitions, the Debtors have assembled an integrated business-to-business distribution platform that connects a highly fragmented supplier base with thousands of commercial customers throughout the United States and Canada.

9. The Debtors also operate specialized businesses that complement their distribution platform, including greenhouse manufacturing, greenhouse construction, installation services, and related horticultural support operations. These businesses broaden the Debtors' customer relationships and allow the enterprise to provide comprehensive solutions extending beyond traditional product distribution. As a result, many customer relationships encompass multiple product categories and service offerings, strengthening customer retention and reinforcing the value of the Debtors' integrated operating platform.

10. The Debtors generate revenue primarily through the wholesale distribution of lawn and garden products, greenhouse supplies, nursery products, hydroponic products, and related horticultural materials. Sales occur through two principal fulfillment channels. Under the first, products are purchased, warehoused, and distributed through the Debtors' distribution network. Under the second, products are shipped directly from suppliers to customers pursuant to vendor-direct fulfillment arrangements coordinated by the Debtors. Together, these complementary

fulfillment models allow the Debtors to offer customers broad product availability while efficiently managing inventory levels across thousands of products.

11. The Debtors' operations span three primary end markets that collectively provide meaningful diversification across the broader horticultural industry. Approximately 52% of revenue is generated from the Lawn & Garden segment, approximately 27% from the commercial Grower segment, and approximately 21% from the Hydroponics segment. Across these end markets, the Debtors distribute a broad range of products, including growing media, fertilizers and crop protection products, greenhouse equipment, environmental control products, containers, planters, irrigation supplies, and numerous additional horticultural products necessary to support commercial growing operations.

12. The Debtors' customer base is similarly diversified. Their customers include independent garden centers, regional greenhouse operators, commercial nursery businesses, hydroponic retailers, commercial cultivators, greenhouse contractors, and other professional participants in the horticultural supply chain. Because these customer groups are highly fragmented, the Debtors' nationwide purchasing capabilities, distribution network, and technical sales organization provide efficiencies for both suppliers and customers.

13. As of the Petition Date, the Debtors maintain relationships with approximately 1,100 active suppliers and offer more than 100,000 stock-keeping units, making the Debtors an important distribution channel for many manufacturers serving the green industry. The Debtors annually process approximately 270,000 customer orders delivered to approximately 15,000 ship-to locations on behalf of approximately 11,000 commercial customers. The Debtors also serve a broader base of individual customers through eCommerce channels operated under the Greenhouse Megastore platform. Approximately 60% of revenue is generated through warehouse fulfillment

operations, with the remaining approximately 40% generated through vendor-direct fulfillment arrangements, providing customers with broad product availability while reducing inventory carrying costs for certain product categories. In addition, the Debtors maintain a fleet of approximately 15 leased trucks and trailers utilized for product shipment from certain warehouse locations, complementing the Debtors' broader freight and logistics infrastructure that supports their nationwide distribution operations.

14. The Debtors maintain their principal offices and historical operating presence in Burton, Ohio together with distribution, manufacturing, and service facilities located across the country. In total, the Debtors operate 19 facilities, of which three are owned—including properties in Danville, Illinois, Kalamazoo, Michigan and Simcoe, Ontario, Canada—and 16 are leased, strategically located in Pennsylvania, Michigan, Minnesota, Virginia, Wisconsin, Georgia, Indiana, Illinois, Colorado, California, Washington, and Texas. Of these facilities, 17 serve as distribution centers encompassing more than 1.5 million square feet of warehouse space, making the Debtors the only distributor in the professional green industry with a national warehouse footprint. The remaining facilities include a greenhouse manufacturing facility in Simcoe, Ontario, Canada, and a customer showroom in Marietta, Georgia.

15. The Debtors' employee base reflects years of investment in specialized industry talent. At the business's peak, the Debtors employed approximately 700 individuals across their distribution, manufacturing, logistics, sales, and administrative functions, a workforce assembled to serve a highly technical and relationship-driven industry. The Debtors invested heavily in building a national sales organization staffed by professionals with deep horticultural expertise, which the Debtors view as a key competitive differentiator. Over time, however, workforce reductions implemented in response to the Debtors' deteriorating financial condition reduced

headcount. As of the Petition Date, the Debtors employ approximately 461 employees (30 of which are employed by the Canadian Debtor (defined below)) in the United States and in Canada.

16. Notwithstanding the strength of the Debtors' operating platform, longstanding supplier relationships and established customer base, the Debtors experienced a series of interrelated operational and financial challenges during fiscal years 2024 through 2026. Those challenges included declining revenue attributable to strategic market exits and customer attrition, tightening vendor credit resulting from deteriorating liquidity, significant working-capital constraints, and broader macroeconomic pressures affecting the horticultural industry. Although management implemented numerous operational improvement initiatives that generated measurable progress in commercial performance, those initiatives were ultimately insufficient to offset the Debtors' near-term liquidity constraints absent a comprehensive restructuring.

17. Accordingly, after carefully evaluating available alternatives and in consultation with the Debtors' advisors, management and the Debtors' board of directors, the Debtors determined that commencing these chapter 11 cases represents the best available means of preserving and maximizing the value of the Debtors' estates, obtaining the liquidity necessary to continue operations during the pendency of these cases, and continuing to pursue a value-maximizing outcome through a going-concern sale of some or all of the Debtors' assets, an orderly liquidation of the Debtors' assets, or a combination thereof, for the benefit of all stakeholders.

## B. History and Growth

18. The Debtors' business traces its origins to 1972, when BFG Supply began operations in Burton, Ohio as a regional distributor serving the horticultural industry. During the ensuing five decades, the enterprise expanded from a local distributor into a diversified North American platform serving customers throughout the United States and Canada. That growth was

achieved through a combination of organic expansion, investments in distribution capabilities, and a series of strategic acquisitions designed to broaden the Debtors' product offerings, geographic reach, and specialized service capabilities.

19. Rather than pursuing acquisitions solely to increase scale, the Debtors historically sought businesses that complemented existing operations, expanded access to new geographic markets, strengthened relationships with suppliers and customers, or added specialized manufacturing, greenhouse, or technical service capabilities. As a result, the enterprise today consists of multiple complementary operating businesses that collectively provide products and services across nearly every major segment of the professional green industry.

20. The Debtors' more recent acquisition strategy continued that approach. In July 2023, the Debtors acquired a portion of the wholesale distribution business of Central Garden & Pet Company, expanding the Debtors' product portfolio and strengthening relationships with independent garden centers and other commercial customers. Approximately one year later, the Debtors acquired the distribution business V-G Supply Co., a wholesale distributor of lawn and garden products, further enhancing the Debtors' position within the commercial grower market and expanding their distribution capabilities in that segment.

21. In addition to their core wholesale distribution business, the Debtors own and operate several specialty businesses that broaden the enterprise's capabilities beyond traditional distribution. These include De Cloet Greenhouse Mfg. Ltd., a manufacturer of greenhouse structures and related components; Green-Tek, LLC, a manufacturer of greenhouse coverings and related products; International Greenhouse Contractors, LLC and its subsidiaries, which provide greenhouse construction and horticultural services; and regional distribution businesses, including GROSouth, Inc. and L&L Nursery Supply, Inc. The Debtors also operate Greenhouse Megastore,

an eCommerce platform acquired in December 2021 that expanded the enterprise's reach into direct-to-customer and online sales channels for greenhouse products and horticultural supplies. Together, these operations provide customers with a combination of products, technical expertise, manufacturing capabilities, and installation services that distinguish the Debtors from many traditional wholesale distributors.

22. The result of these investments is an enterprise that combines wholesale distribution, greenhouse manufacturing, construction services, logistics, inventory management, and technical product support across multiple operating businesses. Although these businesses operate through multiple legal entities, they function as a single commercial enterprise serving many of the same suppliers and customers through common management, coordinated purchasing, shared logistics, and centralized administrative functions. In particular, the Debtors' operating subsidiaries share a common executive leadership team, including a single Chief Executive Officer and a single Chief Financial Officer. The Debtors also maintain a centralized cash management system with all operating disbursements funded from a single main operating account held in the name of BFG Supply Co., LLC. The intercompany transactions that flow through this system allow the Debtors to meet the needs of their customers and vendors efficiently and in a cost-effective manner, and consolidate their management and administration in a way that would not be possible if each entity operated independently. These shared functions notwithstanding, the Debtors' operating subsidiaries were not fully integrated into a unified operating platform following their respective acquisitions. Certain of the subsidiaries retain distinct operational processes, legacy systems, and customer relationships. As discussed further below, the incomplete integration of these businesses contributed to the Debtors' elevated cost structure and inability to capture anticipated acquisition synergies.

**C. <u>Corporate Structure; Independent Governance</u>**

23. The Debtors' organizational structure reflects the series of acquisitions and financing transactions undertaken over many years. Certain holding companies exist principally to facilitate ownership and financing arrangements, while the Debtors' operating assets are concentrated within BFG Supply Co., LLC and its direct and indirect subsidiaries.

24. At the top of the organizational structure sits BFG Supply Investment Holdings, LP ("<u>Investment Holdings</u>"), whose principal equity investor is Pamplona Equity Partners, L.P., together with certain other investors. Below that ownership structure are a series of intermediate holding companies that ultimately own Debtor BFG Purchaser Parent, Inc. and its subsidiaries.

25. Debtor BFG Purchaser Parent, Inc. directly or indirectly owns Debtors Bamboo Purchaser, Inc., BFG Supply Holdings, Inc., BFG Holdings I, Inc., and ultimately BFG Supply Co., LLC, which serves as the principal operating entity for substantially all of the Debtors' wholesale distribution activities. BFG Supply Co., LLC, in turn, directly or indirectly owns numerous operating subsidiaries responsible for regional distribution, logistics, greenhouse manufacturing, greenhouse construction, and related horticultural services.

26. Among these subsidiaries are Debtors BFG Kalamazoo, LLC; BFG Logistics, LLC; L&L Nursery Supply, Inc.; Gard'N-Wise Distributors, Inc.; International Greenhouse Contractors, LLC; Green-Tek, LLC; GROSouth, Inc.; and BFG VG Supply Acquisition, LLC. International Greenhouse Contractors, LLC also owns Greenhouse Solutions, LLC and Greenhouse Contracting Services, LLC, and non-Debtor IGC Horticultural Services, LLC.

27. The Debtors also conduct operations in Canada through BFG Supply Canada Holdings, Inc. (a Delaware holding company) and De Cloet Greenhouse Mfg. Ltd. (an Ontario Corporation) (the "<u>Canadian Debtor</u>"). Those Canadian operations support the broader North

American distribution platform and reflect the enterprise's cross-border operations developed over many years. The Debtors anticipate that the Canadian Debtor will commence ancillary proceedings under Part IV of the *Companies' Creditors Arrangement Act* (Canada) before the Ontario Superior Court of Justice (Commercial List) to seek recognition of these chapter 11 cases as a foreign main proceeding.

28. Not all entities within the overall ownership structure are debtors in these chapter 11 cases. The entities above BFG Purchaser Parent, Inc., including certain upstream holding companies, have not commenced chapter 11 proceedings. The Debtors nevertheless operate as an integrated enterprise, and the relief requested in these chapter 11 cases is directed toward preserving the value of the operating businesses that comprise the Debtors' distribution platform.

29. The Debtors' corporate structure, as described herein, is reflected in the organizational chart attached hereto as **Exhibit A**.

**D. Capital Structure**

30. As of the Petition Date, the Debtors' funded indebtedness consists principally of obligations under two secured financing arrangements: (i) a senior secured revolving credit facility (the "Revolving Credit Facility"), and (ii) a senior secured term loan facility (the "Term Loan Facility" and, together with the Revolving Credit Facility, the "Prepetition Credit Facilities"). These financing arrangements provided the capital necessary to support the Debtors' acquisition strategy, seasonal working-capital requirements, and ongoing operations. Over time, however, declining operating performance and constrained liquidity substantially reduced the flexibility originally provided by these facilities and ultimately rendered the Debtors' capital structure unsustainable outside chapter 11.

### *i. The Revolving Credit Facility*

31. The Revolving Credit Facility is governed by the ABL Credit Agreement, dated as of November 5, 2021 (as amended, the "ABL Credit Agreement"), entered into by and among Bamboo Purchaser, Inc., as the borrower representative, BFG Purchaser Parent, Inc., as Holdings, the other U.S. borrowers and Canadian borrowers from time to time party thereto, the subsidiaries of Bamboo Purchaser, Inc. from time to time party thereto as guarantors, the financial institutions from time to time party thereto as lenders, and ACF Finco I LP, as Administrative Agent, Collateral Agent, and Lead Arranger (the "Prepetition ABL Agent").

32. The Revolving Credit Facility serves as the Debtors' principal source of seasonal working-capital financing. Because the Debtors must build inventory well in advance of the spring selling season, borrowings under the revolving facility historically increased during periods of inventory accumulation and declined as seasonal receivables were collected. This revolving borrowing cycle has long been central to the Debtors' operating model.

33. On June 24, 2026, the Prepetition ABL Agent issued a Notice of Event of Default to the Debtors for purportedly failing to make certain payments due under the ABL Credit Agreement and reserved its right to exercise certain remedies available under the ABL Credit Agreement. On August 12, 2026, the Prepetition ABL Agent issued a Notice of Implementation of Default Rate to the Debtors notifying them of the Prepetition ABL Agent's exercise of its right to interest at the default rate from and after the date upon which the Debtors' were purportedly in default under the ABL Credit Agreement.

34. As of the Petition Date, approximately $43,079,675.97 in Prepetition Revolving Loans remained outstanding under the Revolving Credit Facility, plus other Obligations under the Prepetition ABL Credit Agreement, which has an aggregate commitment of approximately $120

million. The facility is secured by substantially all of the Debtors' assets (including the assets of the Canadian Debtor) and contains financial and operational provisions designed to protect lender collateral, including cash dominion provisions that become operative if the Debtors' excess availability falls below specified thresholds. As amended, the Revolving Credit Facility matures on December 31, 2028.

#### ***ii. The Term Loan Facility***

35. In addition to the Revolving Credit Facility, certain of the Debtors are borrowers and/or guarantors under the Term Loan Facility, which is governed by the Credit Agreement, dated as of November 5, 2021 (as amended, the "Term Loan Credit Agreement"), entered into by and among Bamboo Purchaser, Inc., as Borrower, BFG Purchaser Parent, Inc., as Holdings, the subsidiary guarantors from time to time party thereto, the lenders from time to time party thereto, and Ares Capital Corporation, as Administrative Agent and Collateral Agent.

36. The Term Loan Facility originally provided approximately $210 million of acquisition financing through an initial term loan and a delayed draw facility. As amended, the Term Loan Facility matures on December 31, 2029. The facility, like the Revolving Credit Facility, is secured by substantially all of the Debtors' assets, including the assets of the Canadian Debtor.

37. In light of the Debtors' developing liquidity challenges, the parties amended both the Revolving Credit Facility and the Term Loan Facility in November 2025 (together, the "November 2025 Amendments"). Among other things, the November 2025 Amendments provided the additional borrowing capacity through a new term loan with a principal amount of $45 million and a delayed draw term loan facility with commitments of $15 million, and extended the maturities of the existing instruments. In connection with the November 2025 Amendments, the existing term loans were exchanged, on a cashless basis, into two new classes of term loans:

"Term Loans A" (as defined in the Prepetition Term Loan Credit Agreement), in an aggregate principal amount of $32,500,000, and "Term Loans B" (as defined in the Prepetition Term Loan Credit Agreement), in an aggregate principal amount of $178,449,679.50. Accrued but unpaid interest of $8,199,679.50 through the Fourth Amendment Effective Date was paid in kind by being added to the principal of the exchanged term loans immediately prior to the exchange.

38. Additionally, as part of the November 2025 Amendments, the parties also modified the interest payment mechanics applicable to the Term Loan Facility. As amended, interest accruing on the Term Loan Facility is paid in kind (unless the Debtors affirmatively elect to pay cash interest), a feature that provided the Debtors helpful relief by reducing near-term cash interest obligations. When interest is paid in kind, an additional 3.00% per annum PIK premium is added to the applicable interest rate, further increasing the rate at which the outstanding principal balance grows.

39. Further, in connection with the November 2025 Amendments, Patrick Bartels was appointed as the Independent Manager of Investment Holdings, whose affirmative vote was required for Investment Holdings or any of its subsidiaries to take certain specified actions. In addition, as a result of the occurrence of a Trigger Event (as defined in the Fifth Amended and Restated Agreement of Limited Partnership of Investment Holdings), Mr. Bartels is vested with majority Board authority on all matters brought before the Board, including authority to evaluate strategic restructuring alternatives and overseeing the orderly liquidation and winding up of the affairs of the Debtors.

40. As of the Petition Date, the obligors under the Prepetition Term Loan Facility were obligated to the lenders thereunder in the aggregate outstanding principal amount of not less than $299,456,012.99, consisting of Term Loans A in the aggregate outstanding principal amount of

not less than $137,608,289.31 and Term Loans B in the aggregate outstanding principal amount of not less than $161,847,723.68.

***iii. Intercreditor Agreement.***

41. The Debtors are party to an Intercreditor Agreement, dated as of November 5, 2021 (as amended by the First Amendment dated January 12, 2024 and the Second Amendment dated November 10, 2025, the "Intercreditor Agreement"), by and among ACF Finco I LP, as ABL Agent, and Ares Capital Corporation, as Term Loan Agent. The Intercreditor Agreement governs the relative lien priorities and enforcement rights of the Prepetition Secured Parties with respect to the Debtors' assets, which are divided into two categories: (i) "ABL Priority Collateral," consisting primarily of accounts receivable, inventory, cash, deposit accounts, and related general intangibles, and (ii) "Term Loan Priority Collateral," consisting of all other common collateral, including real estate, equipment, equity interests, and intellectual property. The ABL Agent holds a first-priority lien on ABL Priority Collateral, while the Term Loan Agent holds a first-priority lien on Term Loan Priority Collateral, with each agent holding a second-priority lien on the other's priority collateral.

***iv. Unsecured Claims***

42. As of the Petition Date, the Debtors' unsecured liabilities primarily consist of trade payables owed to vendors and suppliers. As of the Petition Date, accounts payable owing to vendors totaled approximately $48.5 million. In addition, the Debtors owe approximately $1.93 million for employee-related obligations, approximately $459,000 on account of various tax obligations, and approximately $46,500 on account of non-residential lease obligations relating to the Debtors' facilities. The Debtors are continuing to analyze the full scope of their unsecured

liabilities and will provide a more detailed description in the Schedules of Assets and Liabilities and Statements of Financial Affairs to be filed in these chapter 11 cases.

**E. Events Leading to These Chapter 11 Cases**

43. The Debtors' decision to commence these chapter 11 cases was not the result of a single event or isolated business setback. Rather, it followed more than two years of progressively worsening operational, financial, and liquidity challenges that compounded one another over time. Furthermore, during this time period and in the years preceding it, the Debtors made a series of acquisitions, and borrowed substantially to finance such acquisitions. As discussed further below, the Debtors failed to adequately integrate the acquired businesses, which inhibited them from realizing the synergies they had anticipated. Although management undertook significant operational improvements, pursued strategic alternatives, obtained additional lender accommodations, and received substantial equity support, those efforts ultimately proved insufficient to overcome the cumulative effects of declining revenue, constrained liquidity, tightening vendor credit, and the Debtors' highly seasonal working-capital requirements.

44. *Escalating Operating Expenses.* The Debtors' financial challenges were compounded by an operating cost structure that, notwithstanding significant reduction efforts, remained elevated relative to the Debtors' declining revenue base. The Debtors' cost structure was burdened in part by costs associated with integrating a series of acquisitions completed between 2021 and 2024, including the wholesale distribution business of Central Garden & Pet Company in July 2023 and V-G Supply Co. approximately one year later, which brought with them separate facilities, distinct customer bases, and multiple legacy operating and technology systems that required rationalization. The Debtors' inability to fully integrate these businesses perpetuated duplicative costs across the combined platform and constrained the Debtors' capacity to reduce

the outstanding indebtedness incurred to finance the acquisitions. As described further below, the Debtors implemented a series of cost-reduction initiatives that generated meaningful annualized savings. Those savings, however, were outpaced by the magnitude of the Debtors' revenue and gross margin declines during the same period.

45. *Customer Attrition.* During fiscal year 2026, the Debtors experienced significant customer attrition arising principally from turnover within their sales organization. The departure of numerous experienced sales representatives resulted in the loss of significant customer relationships that historically had been managed by those individuals. Although the Debtors recruited replacement personnel and continued investing in their commercial organization, new sales representatives required time to establish customer relationships and rebuild lost business.

46. The commercial impact of this attrition was substantial. Although the Debtors generated approximately $573.7 million of consolidated revenue during fiscal year 2024 and approximately $581.5 million during fiscal year 2025, the Debtors experienced a significant decline in fiscal year 2026. Consolidated revenue fell to approximately $536.5 million, a reduction of approximately $45 million, or nearly 8%, from the prior fiscal year.

47. *Tightening Credit*. The resulting reduction in operating cash flow constrained the Debtors' working capital. Because the Revolving Credit Facility is an asset-based facility, borrowing availability was directly tied to a borrowing base calculated primarily on eligible accounts receivable and eligible inventory, meaning that lower sales generated fewer receivables, which reduced the maximum amount the Debtors could draw on the facility, directly constraining the cash available to fund payroll, vendor obligations, and other operating expenses. As liquidity tightened, the Debtors became increasingly dependent upon vendor credit to maintain inventory levels necessary to support customer demand.

48. The Debtors' suppliers historically extended substantial trade credit, allowing inventory purchases to be financed in the ordinary course of business. As the Debtors' liquidity position deteriorated, however, certain suppliers reduced available credit, shortened payment terms, or otherwise limited inventory availability. Those actions significantly impaired the Debtors' ability to purchase products needed to satisfy customer orders.

49. Importantly, customer demand during portions of this period remained relatively healthy. The principal constraint was increasingly the Debtors' ability to obtain inventory rather than their ability to generate customer orders. In other words, liquidity constraints prevented the Debtors from converting customer demand into realized revenue.

50. *Downward Liquidity Spiral*. The Debtors' reduced inventory availability led directly to lower sales volumes. Lower sales further reduced operating cash flow, which in turn caused additional vendor concern regarding the Debtors' financial condition. As additional suppliers tightened credit, the Debtors' ability to replenish inventory deteriorated further. This self-reinforcing liquidity cycle became increasingly difficult to reverse outside a comprehensive restructuring. This dynamic was further exacerbated by the asset-based nature of the Revolving Credit Facility: as inventory levels declined due to tightening vendor credit, the Debtors' borrowing base contracted correspondingly, further reducing the liquidity available under the Revolving Credit Facility to fund operations.

51. This deterioration also adversely affected gross margins. Reduced purchasing flexibility, changing product mix, pricing pressures, and other operational consequences associated with the Debtors' constrained liquidity compressed profitability during much of fiscal years 2025 and 2026.

52. The Debtors' operating challenges were further exacerbated by broader macroeconomic conditions affecting the horticultural industry, including inflationary cost pressures, reduced discretionary consumer spending affecting portions of the lawn and garden market, and increased product costs across a broad range of the Debtors' product categories that compressed gross margins during fiscal years 2025 and 2026.

53. Despite these challenges, management's operational improvement initiatives began producing measurable results during the latter portion of fiscal year 2026. The Debtors implemented pricing initiatives, expense reductions, freight optimization, inventory management improvements, and other commercial initiatives, which generated meaningful improvements in gross margin and operating performance. By the latter part of fiscal year 2026, the Debtors' gross margins had improved compared to the prior year, demonstrating that the underlying operating platform remained fundamentally sound.

54. Notwithstanding improvements, the Debtors' liquidity forecasts indicated that absent a significant capital infusion, available liquidity would decline steadily during calendar year 2026 and, eventually, excess availability would approach the cash dominion thresholds contained in the Revolving Credit Facility before the period in which they would need to purchase inventory for the following spring selling season. Permitting that circumstance to occur would, in addition to triggering defaults under the Revolving Credit Facility, almost certainly result in substantial destruction of enterprise value.

55. The Debtors concluded that commencing an in-court process offered the greatest opportunity to stabilize operations and maximize value. This conclusion was reinforced by the position of the Debtors' prepetition revolving lenders, who indicated that they would only provide additional financing through a debtor-in-possession financing facility.

**F. <u>Prepetition Restructuring Efforts</u>**

56. In the months before commencing these chapter 11 cases, the Debtors, together with their board of directors and professional advisors, undertook an extensive effort to address the Debtors' operational, financial, and liquidity challenges outside of bankruptcy. Throughout this period, management remained focused on preserving enterprise value, improving liquidity, and avoiding a chapter 11 filing if a viable out-of-court alternative could be achieved. The Debtors evaluated numerous strategic, operational, and financing alternatives, many of which were implemented in whole or in part before the Petition Date.

57. From an operational perspective, the Debtors undertook workforce reductions, facility rationalization and other cost-reduction initiatives intended to better align the Debtors' operating cost structure with reduced revenue levels. In addition, the Debtors implemented rigorous liquidity management procedures designed to preserve vendor relationships while allocating limited cash resources among competing operational needs. The Debtors also worked extensively with their lenders, suppliers, and other business partners in an effort to restore the Debtors' financial position and stabilize the Debtors' ability to obtain vendor trade credit.

58. In parallel with these operational initiatives, the Debtors and their advisors actively explored financing and strategic alternatives. Management engaged constructively with the Debtors' existing lenders regarding amendments to the Prepetition Credit Facilities, pursued additional sources of capital, evaluated potential strategic transactions, and considered other out-of-court restructuring alternatives. Despite these extensive efforts, the Debtors were ultimately unable to obtain sufficient liquidity or consensual financing necessary to support the Debtors' working-capital requirements.

59. Unable to consensually refinance its current debt, the Debtors made the decision to hire SSG Advisors, LLC ("SSG") on August 6, 2026. Since that time, SSG has fielded multiple inbound indications of interest and also commenced a broader outreach program to gauge interest in a potential going concern transaction. As of the Petition Date, the Debtors are engaged in active negotiations with parties that may serve the role of stalking horse bidder for certain of the Debtors' assets. While those conversations are progressing, management has concluded that chapter 11 represents the only practical means of preserving and maximizing the value of the Debtors' estates, whether through a going-concern sale, an orderly liquidation, or a combination thereof, for the benefit of all stakeholders.

60. Accordingly, the objective of these chapter 11 cases is to maximize value through three complementary and concurrent workstreams: (i) a court-supervised marketing and sale process for some or all of the Debtors' assets on a going-concern basis; (ii) an orderly monetization and liquidation of the Debtors' inventory, fixed assets, and receivables; and (iii) a real estate disposition program with respect to the Debtors' owned properties and non-residential real property leases. These workstreams are designed to proceed in parallel, rather than sequentially, thereby preserving strategic optionality while allowing the Debtors to monetize assets in an orderly manner. The Debtors have retained specialized professionals to lead each workstream.

61. *Going-Concern Sale Process.* The Debtors have retained SSG as their investment banker to conduct a comprehensive marketing and sale process designed to identify potential transactions for some or all of the Debtors' businesses and assets on a going-concern basis. The sale process will proceed concurrently with the Debtors' other monetization efforts and is expected to be conducted on an expedited basis, with the process targeted for completion in approximately

60 days. The Debtors intend to file a motion in the early days of these chapter 11 cases seeking approval of bidding procedures governing the solicitation and selection of bids.

62. *Liquidation Program.* In parallel with the going-concern sale process, the Debtors have engaged SB360 Capital Partners, LLC and Tiger Capital Group, LLC, acting through a joint venture (collectively, the "Liquidation Consultant"), to assist the Debtors in conducting an orderly monetization of certain inventory, accounts receivable, machinery, equipment, fixtures, and other assets. The liquidation program has been structured to operate in tandem with the Debtors' going-concern marketing process rather than to foreclose a potential sale transaction. Concurrently with the commencement of these chapter 11 cases, the Debtors will file a motion seeking authority to assume the agreement governing the Liquidation Consultant's engagement and to sell the assets. Importantly, if the Debtors determine to pursue a going-concern sale of all or substantially all of their assets, the Consulting Agreement may be terminated to facilitate that transaction. This flexibility enables the Debtors to begin monetizing assets promptly while preserving their ability to pivot to a going-concern transaction if doing so would maximize value.

63. *Real Estate Monetization.* The Debtors also are pursuing a separate real estate monetization process. The Debtors own three facilities and lease 16 strategically located warehouse and distribution facilities and showrooms throughout the United States and Canada. The Debtors have retained A&G Realty Partners, LLC ("A&G") as their real estate advisor. In that capacity, A&G will assist the Debtors in marketing and selling their owned real property and in marketing and selling their interests in non-residential real property leases.

64. In my judgment, pursuing these three pathways concurrently, with each led by professionals experienced in the relevant asset class and transaction process, provides the Debtors with the flexibility necessary to evaluate competing alternatives as they develop and represents the

most effective means of maximizing value for the benefit of the Debtors' estates and their stakeholders.

* * *

## PART II: FIRST DAY MOTIONS

65. Concurrently with the commencement of these chapter 11 cases, the Debtors have filed the First Day Motions seeking authority to implement a series of measures necessary to preserve the value of the Debtors' estates, maintain uninterrupted business operations, protect relationships with employees, customers, suppliers, and other constituencies, and facilitate an orderly restructuring and sale process.

66. Collectively, the relief requested in the First Day Motions is intended to stabilize the Debtors' operations during the critical initial stages of these chapter 11 cases and minimize the disruption that might otherwise result from the commencement of bankruptcy proceedings. In my business judgment, each request is an integral component of the Debtors' overall restructuring strategy, and the requested relief should be viewed as part of a coordinated effort to preserve enterprise value rather than as a series of unrelated procedural requests.

67. Specifically, the Debtors have filed the following First Day Motions:

- **DIP Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Creditors, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*
- **Cash Management Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued (A) Use of Existing Cash Management System, Bank Accounts, and Business Forms and Payment of Related Prepetition Obligations and (B) Performance of Intercompany Transactions in the Ordinary Course of Business, (II) Granting a Limited Waiver of Section 345(b) Deposit and Investment Requirements, and (III) Granting Related Relief*
- **Liquidation Services Agreement Motion**. *Debtors' Motion for Interim and Final Orders (A) Authorizing the Debtors to Assume the Consulting Agreement; (B) Authorizing and*

*Approving the Sales of Assets Free and Clear of All Liens, Claims, and Encumbrances; and (C) Granting Related Relief*

- **Tax Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief*
- **Wages Motion**. *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing, but Not Directing, the Debtors to (I) Pay Prepetition Wages, Compensation, Employee Benefits, and Other Employee Obligations, (II) Continue Certain Employee Benefit Programs in the Ordinary Course, (B) Authorizing All Banks to Honor Prepetition Checks for Payment of Prepetition Employee Obligations, and (C) Granting Related Relief*
- **Insurance Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance and Surety Coverage, and Letter of Credit Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, Surety Bonds, and Letters of Credit, and (C) Continue to Pay Broker Fees, and (II) Granting Related Relief*
- **Epiq Retention Application**. *Debtors' Application for Entry of an Order (I) Approving the Retention and Appointment of Epiq Corporate Restructuring, LLC as the Claims and Noticing Agent to the Debtors, Effective as of the Petition Date, and (II) Granting Related Relief*
- **Joint Administration Motion**. *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief*
- **Redaction and Service Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Redact or Withhold Certain Confidential Information of Customers, (B) Redact Certain Personally Identifiable Information of Individuals, and (C) Serve Parties in Interest by Email, and (II) Granting Related Relief*
- **Critical Vendors Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Certain Critical Vendors and (II) Granting Related Relief*
- **Utilities Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Service, and (IV) Granting Related Relief*
- **Customer Programs Motion**. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Honor, Maintain, and Administer Customer Programs and Related Prepetition Business Practices, and (II) Granting Related Relief*
- **Foreign Representative Motion**. *Debtors' Motion for Entry of an Order (I) Authorizing De Cloet Greenhouse Mfg. Ltd. to Act as Foreign Representative in Canadian Proceeding and (II) Granting Related Relief*

68. Absent prompt approval of these requests, the Debtors' ability to preserve customer confidence, maintain supplier relationships, retain employees, administer these chapter 11 cases efficiently, and maximize the value of their businesses would be impaired.

69. Among the relief requested on the Petition Date, none is more important to the Debtors' ability to preserve value than approval of the proposed debtor-in-possession financing facility (the "DIP Facility"). The DIP Facility consists of a postpetition super-priority senior secured, asset-based revolving credit facility in an aggregate principal amount of up to $55 million, consisting of (a) revolving new money credit commitments and (b) a cashless roll-up and refinancing of all outstanding revolving loans of the DIP lenders under the Debtors' prepetition Revolving Credit Facility, together with the cash payment of all accrued interest, fees, and other amounts owing to such lenders as of the Petition Date.

70. The Debtors are entering chapter 11 with limited liquidity, significant working-capital requirements, and an immediate need for financing sufficient to stabilize operations and provide the runway necessary to pursue the parallel sale and liquidation strategy described above.

71. Without immediate access to the DIP Facility and authority to use cash collateral, the Debtors would be unable to fund their operations, pursue the foregoing workstreams, or administer these chapter 11 cases. Any delay or inability to draw under the DIP Facility would require the Debtors to cease operations and cause immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.

72. The proposed DIP Facility represents the culmination of an extensive financing process undertaken by the Debtors and their advisors before the Petition Date. Working closely with management, SSG and the Debtors' advisors evaluated a variety of financing alternatives, including from existing stakeholders and third-party sources. Ultimately, no third party that the

Debtors communicated with, and no other party that the Debtors are aware of, was willing to provide postpetition financing to the Debtors on an unsecured, junior lien, or even priming basis. No party contacted, other than the lenders under the Debtors' prepetition Revolving Credit Facility, was willing to provide postpetition financing.

73. After extensive, arm's-length negotiations with the prepetition secured parties, the Debtors were able to secure the proposed DIP Facility. Accordingly, management determined that the proposed DIP Facility constitutes the best financing reasonably available to the Debtors under the circumstances.

74. In my judgment, approval of the DIP Facility is essential to preserving the value of the Debtors' estates and is an exercise of the Debtors' sound business judgment. Among other things, the DIP Facility will provide the Debtors with sufficient liquidity to satisfy postpetition obligations in the ordinary course of operations, fund the costs of administering these chapter 11 cases, and provide the runway necessary to pursue the Debtors' value-maximizing strategy. Without the proposed financing, the Debtors' restructuring efforts would almost certainly fail, resulting in immediate and irreparable harm to the Debtors' estates.

75. In addition to the DIP Motion, I have reviewed each of the other First Day Motions filed contemporaneously with this Declaration and am familiar with the facts set forth therein. To the extent additional factual support is required, the facts described throughout this Declaration are incorporated into each of those motions.

76. In my business judgment, each request for relief is narrowly tailored to address an immediate operational need arising from the commencement of these chapter 11 cases. Collectively, the requested relief will permit the Debtors to transition into chapter 11 with minimal

disruption, preserve the confidence of key constituencies, continue serving customers in the ordinary course, and maximize value for the benefit of all stakeholders.

77. I further believe that delaying or denying the requested relief would impair the Debtors' restructuring efforts and could result in immediate and irreparable harm to the Debtors' estates through loss of enterprise value.

78. Accordingly, I respectfully submit that approval of the First Day Motions is in the best interests of the Debtors, their estates, creditors, employees, customers, suppliers, and all other parties in interest.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: August 19, 2026
Nashville, Tennessee

By: */s/ Adam Zalev*
Name: Adam Zalev
Title: Chief Restructuring Officer

# Exhibit A

## Organizational Chart

## BFG Debtor Organizational Chart

Debtor names and last four digits of federal tax identification numbers

